PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE
THIRD CIRCUIT
_____

No. 08-1945
_____

WAYNE COOMBS,

Appellant

v.

DAVID DIGUGLIELMO; THE DISTRICT ATTORNEY OF
THE COUNTY OF PHILADELPHIA;
THE ATTORNEYGENERAL
OF THE STATE OF PENNSYLVANIA
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal No. 2-04-cv-01841)
District Judge: Honorable Cynthia M  Rufe

Submitted Pursuant to Third Circuit LAR 34.1(a)

October 2, 2009

Before:  McKEE, *Chief Judge,* CHAGARES, and
NYGAARD, *Circuit Judges*

(Opinion filed: July 30, 2010)

Leon A. Williams, I, Esq.
1st Floor
327 South 13th Street
Philadelphia PA 19107

*Counsel for Appellant*

Thomas W. Delgenos, Esq
Molly S. Lorber, Esq.
Office of the District Attorney
Three South Penn Square
Philadelphia PA 19107

*Counsel for Appellee*

_____

OPINION

_____

McKEE, *Chief Judge*

Wayne Coombs appeals from the district court's denial of the habeas corpus petition he filed pursuant to 28 U.S.C. §§ 2241(c)(3) and 2254. He argues that the prosecutor exercised his peremptory challenges in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). For the reasons set forth below, we will

2

remand this matter to the district court for an evidentiary hearing on Coombs' *Batson* challenge.

## I. Factual Background

On February 22, 2000, Coombs was arrested for a string of robberies that took place in Philadelphia from the fall of 1999 into the winter of 2000. The charges stemming from those robberies were consolidated for a trial which began in September 2001. At that trial, the majority of the prosecution's evidence came from eyewitnesses who identified Coombs as the armed robber. Coombs' mother testified on his behalf. Both Coombs and his mother are Black. Nearly all of the prosecution witnesses, including the robbery victims and police officers, are White. The trial ended in a hung jury.

Coombs was re-tried beginning in November 2001. On the first day of *voir dire*, the prosecutor raised a "reverse *Batson*" challenge because defense counsel struck three White

3

jurors.[1]  The prosecutor told the court that, "[i]t happened the last time, but I didn't do anything about it.  I'm doing something about it this time."  App. at 106.  Defense counsel provided the following explanation for his peremptory strikes: (1) Juror No. 35 stated that she would be more likely to believe police officers than another citizen and she had two friends that had been abducted from the street;  (2) Juror No. 8 had two brothers-in-law who were retired police officers, a couple of her neighbors were police officers, and she was married to a firefighter; and (3) Juror No. 21 indicated that "she would have problems . . . following instructions that the defendant doesn't have to take the stand or present evidence, and that it couldn't be held against him if he elects to remain silent," her father-in-law was a retired

---

[1]*See Georgia v McCollum*, 505 U.S. 42 (1992) (holding that the Equal Protection Clause forbids a defendant from exercising peremptory challenges to strike jurors based upon their race).

police sergeant, she stated that she would be inclined to believe the testimony of a police officer, and she worked at a bank that had been robbed. App. at 106-09.

Defense counsel also raised a *Batson* challenge based on the prosecutor's use of two peremptory strikes against Black females. Defense counsel told the court that "the last jury hung because of a [B]lack female. Today we had two [B]lack females. Both of them have been stricken for no good reasons." App. at 110. The court then asked the prosecutor: "Why don't you just put your reasons on the record?" *Id*. The prosecutor initially responded that defense counsel is "just retaliating for what I did," *id*., but then said that he struck Juror No. 19 because she "was an eyewitness to a shooting, and her mother was robbed, she said, a long time ago." App. at 110-12. He stated that he struck Juror No. 14 because his brother "was charged with robbery over fifteen years ago." *Id.*

5

The court denied both motions, stating: "These are what lawyers do with peremptory challenges. They're not race-based. . . . As long as we have peremptory challenges, lawyers are going to make judgments maybe based on hunches, maybe based on prior experiences, maybe based on feelings, but they're not based on race. Both of you are much too good lawyers to do something like that." App. at 112.

At the conclusion of *voir dire*, defense counsel again raised the *Batson* challenge. He noted that the prosecutor used five of his six peremptory challenges to strike Black venire persons, and more specifically, that the prosecutor had used four peremptory strikes against Black females and one against a Black male. App. at 138. Before the prosecutor could offer a racially-neutral explanation, as required under *Batson*, the trial court stated: "I'm not finding there's another pattern." *Id*. The prosecutor nevertheless explained that Juror No. 22's cousin had

6

been a witness to a robbery and that Juror No. 4 had a nephew who had recently been shot, another nephew in jail awaiting gun charges, and a friend who was a defense attorney.

After the prosecutor concluded, defense counsel questioned the prosecutor's use of a peremptory strike to remove Juror No. 1, a Black male. The prosecutor's entire explanation was as follows:

> I just didn't like him, your Honor. I don't really have a sound reason. . . . I don't know, just the way he was looking at me.
> If that's a reason, it's justified, but your Honor found there's no pattern. I mean, I just didn't like him, and he didn't check off many boxes, but I went with my hunch. . . .

App. at 140.

The court's only response was: "Let's go. Are we ready to? Do we have the bills?" *Id*. Defense counsel then inquired: "Your Honor is going to accept the Commonwealth's assertions

7

and deny my motion?" The court answered: "Yes." *Id.*

The court did not further inquire into his explanation. The final composition of the jury in Coombs' second trial consisted of one Black male, one Black female, and ten White jurors. The jury convicted Coombs of nine counts of robbery and two counts of possessing an instrument of crime in violation of 18 PA. CONS. STAT. §§ 3701 and 907, respectively.

At Coombs' sentencing, defense counsel again raised the issue of the prosecutor's peremptory challenges. Counsel first tried to clarify the record with regard to two of the venire persons who did not indicate their race on the juror questionnaire. App. at 148. He asked that the record indicate that Juror No. 14 was a Black female and that Juror No. 9, who was chosen for the jury, was a White male. When the court asked the prosecutor if he would stipulate to the race of the two jurors, the prosecutor responded, "I don't recall [Juror No. 14],

8

but I do recall the [Juror No. 9] as being a [W]hite male." App. at 149.

Defense counsel then tried to introduce evidence of a conversation that he alleged had taken place between himself and the prosecutor. He argued that it was relevant to the prosecutor's exercise of peremptory strikes. However, before he could elaborate, the prosecutor interjected: "I object to this because I don't think this information should be before the Court. It's complete hearsay." App. at 150. Defense counsel argued that the conversation was relevant to establishing the discriminatory motive behind the prosecutor's peremptory strikes. However, the court refused to allow defense counsel to proceed because in its view, the conversation was "not relevant to anything." App. at 152. Defense counsel's multiple attempts to explain the conversation's relevancy were cut off by the court's continued insistence that "[i]t's irrelevant." App. at 151-

9

52. The court did, however, tell defense counsel that he could "submit an affidavit," adding that it "[did not] want to get into that." *Id*.

Defense counsel later submitted an affidavit, which stated that he had a conversation with the prosecutor after the first trial but before the second trial. App. at 156-57. The prosecutor purportedly said to him that a juror from the first trial had advised him that there had been only one holdout juror, and that this juror was a Black female. Defense counsel also explained that he had an additional conversation with the prosecutor after the second trial concluded but before sentencing. Defense counsel stated that the prosecutor said to him that the Black female juror from the first trial "had voted not guilty because the defendant was [B]lack and she was [B]lack." App. at 156. Defense counsel believed that those statements were relevant to determining if the prosecutor's experience during the first trial

10

caused him to try to exclude Black jurors from the second jury.

The trial court denied Coombs' post-trial motions and sentenced him to 59-to-165 years in prison. Coombs appealed to the Pennsylvania Superior Court alleging, *inter alia*, that the prosecutor had discriminated against Black venire persons during jury selection in violation of *Batson.* The Superior Court rejected Coombs' claims without reaching the merits of the *Batson* claims. *Commonwealth v. Coombs*, 832 A.2d 534 (table) (Pa. Super. Ct. 2003), No. 954 E.D. App. 2002, slip op. at 5 (Pa. Super. Ct. July 21, 2003). The court ruled that those claims had not been raised as required by Pennsylvania's "*Spence* rule."[2]

---

[2] The *Spence* rule requires an appellant raising a *Batson* challenge "to make a record identifying the race of venirepersons stricken by the Commonwealth, the race of prospective jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the final jury selected." *Commonwealth v. Holloway*, 739 A.2d 1039, 1045 (Pa. 1999) (internal quotations omitted).

11

It held that, "where an appellant fails to make a record for review of a *Batson* challenge [as required by the *Spence* rule], this Court is unable to consider a claim that the trial court failed to find a prima facie case under *Batson*." *Id.* (internal quotations omitted). Thereafter, the Pennsylvania Supreme Court denied discretionary review, *Commonwealth v. Coombs*, 841 A.2d 528 (Pa. 2003), and Coombs filed the habeas petition that is now before us.

In his habeas petition, Coombs again alleges that the prosecution discriminated against Black venire persons in violation of *Batson*.[3] The petition was referred to a Magistrate

---

[3]  After Coombs filed his habeas petition, the Commonwealth filed an unopposed motion to stay the proceedings pending the outcome of the petition for *certiorari* that had been filed in *Holloway v. Horn*, 355 F.3d 707 (3d Cir. 2004), as both parties believed that case could effect the resolution of Coombs' habeas petition. The Supreme Court subsequently denied *certiorari* in that case. *See Beard v. Holloway*, 543 U.S. 976 (2004).

12

Judge who issued a Report and Recommendation ("R&R") recommending that the petition be dismissed. The district court adopted the R&R and denied Coombs' habeas petition. The district court ruled that Coombs' *Batson* claim was subject to the deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and that Coombs had failed to demonstrate that the state courts' decision was contrary to, or involved an unreasonable application of, *Batson*, as required for relief under AEDPA. This appeal followed.

## II. Jurisdiction and Standard of Review

We have appellate jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a). Our review of the district court's legal conclusions is plenary. *Holloway v. Horn*, 355 F.3d 707, 713 (3d Cir. 2004). Where a district court "'did not hold an evidentiary hearing and engage in independent fact-finding, but

13

rather limited the habeas evidence to that found in the state court record,' our review of its final judgment is plenary." *Hardcastle v. Horn*, 368 F.3d 246, 254 (3d Cir. 2004) (quoting *Scarbrough v. Johnson*, 300 F.3d 302, 305 (3d Cir. 2002)).

### III. Discussion

### A. Deference Under the AEDPA

Under the AEDPA, "a state prisoner's habeas petition must be denied as to any claim that was 'adjudicated on the merits in State court proceedings' unless the adjudication was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Holloway*, 355 F.3d at 718 (quoting 28 U.S.C. § 2254(d)(1) & (2)). "We have interpreted § 2254(d)'s 'adjudication on the merits' language to mean that

14

'when, although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA . . . do not apply.'" *Id.* (quoting *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001) (additional citations omitted).

In *Holloway*, we concluded that because the state court found it "'impossible to determine' whether Holloway's underlying *Batson* claim 'has arguable merit,' it plainly did not render an 'adjudication on the merits' of that claim for purposes of applying the AEDPA standards." *Id.* at 719 (applying the pre-AEDPA standard where the Pennsylvania Supreme Court dismissed a PCRA claim that alleged a *Batson* violation because the claim did not meet *Spence's* procedural requirements).[4]

---

[4] In *Holloway*, we also concluded that even if we applied the AEDPA deferential standard, applying the *Spence* rule to bar a *Batson* violation was "'contrary to' and an 'unreasonable application of' the *Batson* standard." 355 F.3d at 729. *See also Abu-Jamal v. Horn*, 520 F.3d 272 (3d Cir.

15

Coombs' claim here was treated the same as Holloway's was. In both cases, the state appellate court refused to address the merits of the *Batson* claim because the defendant had not satisfied the requirements of Pennsylvania's *Spence* rule.

Inasmuch as the state courts did not reach the merits of Coombs' *Batson* challenge, our review of that claim is not subject to AEDPA's deferential standard, and we therefore afford *de novo* review. Nevertheless, we still presume that the state courts' conclusions of fact are correct unless, *inter alia*, they are not "fairly supported by the record." 28 U.S.C. §2254(d)(8); *Holloway*, 355 F.3d at 719.

## B. The Appropriate *Batson* Inquiry.

The Equal Protection Clause "prohibits a prosecutor from using a peremptory challenge to strike a prospective juror solely

---

2008), *vacated and remanded on other grounds by Beard v. Abu-Jamal*, 130 S. Ct. 1134 (2010).

16

on account of race." *Holloway*, 355 F.3d at 719 (citing *Batson*, 476 U.S. at 88). "As in any equal protection case, the burden is . . . on the defendant who alleges discriminatory selection of the venire to prove the existence of purposeful discrimination." *Batson*, 476 U.S. at 93 (internal citations and quotations omitted). However, a *Batson* challenge is not defeated merely because the prosecutor purports to offer a race-neutral reason for striking the juror. Rather, "the rule in *Batson* . . . requires the judge to assess the plausibility of that reason in light of *all evidence* with a bearing on it." *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005) (emphasis added).

Thus, *Batson*, "establish[ed] a three-step inquiry for determining the constitutionality of challenged peremptory strikes." *Hardcastle*, 368 F.3d at 255 (citing *Riley v. Taylor*, 277 F.3d 261, 275 (3d Cir. 2001)). When a *Batson* challenge is raised, "[f]irst, the trial court must determine whether the

defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race." *Rice v. Collins*, 546 U.S. 333, 338 (2006). "Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question." *Id.* (citing *Batson*, 476 U.S. at 97-98). "Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination." *Id.* (citing *Batson*, 476 U.S. at 98).

Thus, "in considering a *Batson* objection . . . all of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008).[5]

---

[5] The state argues, and the district court agreed, that a prosecutor need only express a race-neutral reason—even if is "implausible"—for striking the juror to overcome a *Batson* challenge. *Coombs v. Diguglielmo*, Civ. No. 04-1841, slip op. at 9 (E.D. Pa. February 29, 2008). However, that is misleading. The prosecutor need only state a race-neutral reason to satisfy step two of the *Batson* analysis, but the trial

A trial court should look to all of the evidence and surrounding circumstances, including the context in which strikes were exercised, to determine whether the prosecutor's proffered reasons for striking a juror are pretextual and whether the defendant has shown that the prosecutor had a discriminatory intent. *See Riley*, 277 F.3d at 283 (stating that evidence pertaining to a *Batson* challenge "should not be reviewed in isolation"). As the Court explained in *Snyder*, "all of the circumstances that bear upon the issue of racial animosity must be consulted." 552 U.S. at 478 (citing *Miller-El*, 545 U.S. at 239) (finding a *Batson* challenge had merit where the "trial

court *must* conduct an analysis of the proffered reason for the strike under step three to determine if the reason the prosecutor offers is merely a pretext designed to mask the improper consideration of race to exclude jurors. *Johnson v. California*, 545 U.S. 162, 171 (2005) (citing *Purkett v. Elem*, 514 U.S. 765, 768 (1995)). Indeed, merely accepting any purportedly race-neutral reason that a skilled attorney can conjure up in response to a *Batson* challenge would reduce the process of resolving *Batson* challenges to a farcical ritual.

19

judge simply allowed the challenge without explanation").

Thus, "the prosecutor's questions and statements . . . may support or refute an inference of discriminatory purpose," *Holloway*, 355 F.3d at 727 (citing *Batson*, 476 U.S. at 96-97), and the three-step inquiry for resolving *Batson* claims allows the trial court to respond to a *Batson* challenge in a meaningful, rather than a *pro forma*, manner. Trial courts fail to engage in the required analysis when they "fail[] to examine all of the evidence to determine whether the State's proffered race-neutral explanations [a]re pretextual." *Riley*, 277 F.3d at 286.

The prosecutor's "strike rate" when compared to the final composition of the jury is particularly relevant. *Miller-El*, 545 U.S. at 241. "More powerful . . . are side-by-side comparisons of some [B]lack venire panelists who were struck and [W]hite panelists allowed to serve. If a prosecutor's proffered reason for striking a [B]lack panelist applies just as well to an otherwise-

20

similar non[B]lack who is permitted to serve, that is evidence tending to prove purposeful discrimination *to be considered at Batson's third step*." *Id.* (emphasis added). *See also Riley*, 277 F.3d at 282 (finding that this comparison "is relevant to determining whether the prosecution's asserted justification for striking the black juror is pretextual").

"[T]he requirement that the state courts faced with a *Batson* challenge engage in the critical step three analysis is not a product of our own creativity but an accepted element of a habeas court's obligation to examine whether a defendant's constitutional right to a race-neutral jury has been infringed." *Riley*, 377 F.3d at 290 (internal citations omitted). "Although a judge considering a *Batson* challenge is not required to comment explicitly on every piece of evidence in the record, some engagement with the evidence considered is necessary as part of step three of the *Batson* inquiry." *Id*. at 289. *See also*

21

*Holloway*, 355 F.3d at 712 (remanding where "the trial court rendered no express or otherwise articulated ruling on [the defendant's] objections; instead, it implicitly rejected the *Batson* challenge by letting the matter proceed to trial").[6]

In *Hardcastle*, after examining the record, we stated that "we cannot conclude . . . that the [state courts'] resolution of [the defendant's] claim amounted to an objectively reasonable application of *Batson* . . . [because the state court] failed to conduct a full and complete step three analysis." 368 F.3d at

---

[6] Indeed, even if we were to apply the deferential AEDPA standard, a state court's "[f]ailure to make a step-three finding . . . would render the state court's decision either 'contrary to' or an 'unreasonable application' of *Batson*." *Bond v. Beard*, 539 F.3d 256, 264 (3d Cir. 2008) (citing *Hardcastle*, 368 F.3d at 259).

255.[7] Where the state court fails to undertake a full step three analysis, as required by *Batson*, we will remand for the district court to engage in independent fact-finding. *Id*.

Here, as in *Hardcastle,* the trial court failed to conduct a full and complete *Batson* step three analysis. In *Hardcastle*, the prosecutor wanted to provide the trial court with relevant information regarding her reasons for exercising twelve peremptory strikes against Black venire persons but the trial court refused to hear the evidence. *Id*. at 251. Hardcastle's counsel moved for a mistrial and the following exchange occurred:

**The Court**: I'm not going to argue the point. There's no need to. I'm going to deny your motion. Your record is correct, and

---

[7] In *Hardcastle*, we were applying the deferential AEDPA standard and yet, we still remanded the case for an evidentiary hearing after finding that the state court's application of *Batson* was unreasonable under clearly established federal law.

we now proceed. Is there any other motion?
**Prosecutor:** May I put something on the record with regard to the issue?
**The Court**: No.
**Prosecutor:** Not in defense.
**The Court:** No.
**Prosecutor:** Okay.
**The Court:** Now that gets rid of the problem.

*Id*. at n.1.

Here, as in *Hardcastle*, it is clear from the record that the court effectively omitted the third step of the *Batson* inquiry by unreasonably limiting the defendant's opportunity to prove that the prosecutor's proffered reasons for striking Black jurors were pretextual, thereby improperly restricting the defendant's ability to prove discriminatory intent.

Moreover, the court did not make the findings required under *Batson*. Rather, it appears to have dismissed Coombs' *Batson* claim because it believed the defense attorney and the prosecutor were "much too good lawyers to do something like

24

that." Relying upon its view of counsel's competence and/or professionalism, the court failed to inquire into whether the prosecutor's purported reasons for striking the jurors were pretextual, a crucial part of the third step of *Batson*.[8]

Even more troubling is the fact that the court did not examine the prosecutor's statements that he struck Juror No. 1 because he "just didn't like" the juror and because the juror was giving him "bad looks." Although the prosecutor did explain that the juror "didn't check off many boxes [on the jury questionnaire]," the court's insistence that the trial proceed ("let's go") foreclosed any inquiry into whether the prosecutor accepted White jurors who checked off a similar number of

---

[8] The trial court did this analysis only after the fact, in a memorandum opinion prepared for the state appeal. This analysis was not considered by the state appellate court because the state appellate court did not reach the merits of this issue.

boxes. That would have been an essential part of any meaningful inquiry into the prosecutor's explanation. As we have just noted, "side-by-side comparisons" of Black jurors who were struck and White jurors who were allowed to serve can often be particularly "powerful" in a *Batson* inquiry. *Miller-El*, 545 U.S. at 241.

As also noted earlier, the prosecutor's response to defense counsel's challenge to the dismissal of Juror No. 1 also included the concession that: "I don't really have a sound reason." On this record, there is no way of knowing if the prosecutor's action was motivated by a genuine concern for Juror No. 1's impartiality, or whether the prosecutor's misgivings arose from the fact that the juror was Black. We do not intend to suggest an answer to that question. We do, however, require that an appropriate inquiry be undertaken by the court in response to a *Batson* challenge; particularly given

26

the prosecutor's vague and elusive explanation and the apparent concession that he was not sure why he stuck Juror No. 1.

Like anyone else, trial attorneys possess those human frailties that make each of us far too susceptible to social conditioning and the subliminal bias that may result. Thus, although we do not suggest this happened here, we are reminded of Justice Marshall's observation in *Batson* that "[an attorney's] own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically." 476 U.S. at 106 (Marshall, J. concurring). Accordingly, "outright prevarication by [attorneys is not] the only danger . . . It is even possible that an attorney may lie to himself in an effort to convince himself that his motives are legal." *Id.* (internal citation and quotations omitted). Although we again stress that we are not suggesting

27

what this prosecutor's motivation was, trial court's must be particularly vigilant when Black jurors are struck because an attorney is acting on a "hunch."

This means that a trial court must be exceedingly careful about rejecting a *Batson* challenge merely because the prosecutor explains that s/he did not like the way a juror looked at her/him.  Although counsel's discomfort with real or perceived "looks" from a prospective juror may arise from factors that would readily survive a *Batson* challenge after an appropriate inquiry, Justice Marshall's admonition in *Batson* cautions that such discomfort may not similarly arise if a White juror looks at counsel the same way.  Therefore, courts should not allow nebulous expressions of discomfort to justify striking a juror.  *Batson* requires an appropriately tailored inquiry, an opportunity for opposing counsel to argue that the proffered reasons are pretextual, and a finding by the trial court.  If it

28

were otherwise—and an unexamined explanation were allowed to survive a *Batson* challenge, *Batson* inquires would quickly be reduced to a meaningless procedural ritual.

We realize that it may be uncomfortable and unpleasant for a trial judge to undertake such a difficult and subtle inquiry with the precision and persistence that may be required to determine counsel's true reasons for striking a juror. No judge wants to be in the position of suggesting that a fellow professional - whom the judge may have known for years - is exercising peremptory challenges based on forbidden racial considerations. However, we also realize that if *Batson* is to be given its full effect, trial courts must make precise and difficult inquiries to determine if the proffered reasons for a peremptory strike are the race-neutral reasons they purport to be, or if they are merely a pretext for that which *Batson* forbids.

Nor is it relevant that the prosecutor appears to have

offered race-neutral explanations for all but one peremptory challenge. "[A] prosecutor's purposeful discrimination in excluding even a single juror on account of race cannot be tolerated as consistent with the guarantee of equal protection under the law." *Holloway*, 355 F.3d at 720 (citing *Harrison v. Ryan*, 909 F.2d 84, 88 (3d Cir. 1990)). Although we are not suggesting that the district court should only consider the prosecutor's strike of Juror No. 1 on remand, we do note that if Juror No. 1, and only Juror No.1, was struck because of his race, then the *Batson* challenge should have been sustained.

The error here is compounded by the court's refusal to allow evidence of the alleged conversations between the prosecutor and defense counsel that could have supported the defense counsel's claim of bias. That evidence, if accepted, could have established that the prosecutor believed that he failed to get a conviction in Coombs' first trial only because of a

30

sympathetic Black juror. Such evidence, viewed against the prosecutor's explanation that he "just didn't like" one of the prospective jurors (who he conceded he had no good reason to strike) may well have caused an objective fact finder to conclude that Coombs' *Batson* challenge should have been sustained.

We realize, of course, that defense counsel was able to put the alleged out of court statement of the prosecutor before the court in an affidavit. However, that is a woefully inadequate substitute for a hearing under these circumstances. Moreover, it is obvious that the court had already determined that the *Batson* challenge was more irritating than meritorious. It had already explained that the proffered evidence was "not relevant to anything" even though it went directly to the prosecutor's frame of mind in exercising peremptory challenges during the selection of the second jury. Thus, we cannot say that merely

31

allowing defense counsel a pro forma opportunity to submit an affidavit is consistent with the kind of serious inquiry required under *Batson*'s third step.[9]

## IV. Conclusion

Accordingly, we will remand the case to the district court to hold an evidentiary hearing consistent

---

[9] The state argues that this evidence should be excluded as hearsay evidence, a determination not made by the state trial court. However, the evidence was clearly offered to establish the prosecutor's state of mind. It was not offered to establish that a Black juror actually refused to convict Coombs during the first trial. Therefore, it is not hearsay. Fed. R. Evid. 801(c) (defining hearsay as statements "offered in evidence to prove the truth of the matter asserted").

We assume that, on remand, the district court will give the evidence whatever weight it deserves notwithstanding the court's initial inclination to ignore it as "not relevant to anything."

with this opinion.[10]

---

[10]"We do not have authority under the federal habeas statutes, 28 U.S.C. § 2241 or § 2254, to remand a habeas corpus petition to a state court for an evidentiary hearing." *Keller v. Petsock*, 853 F.2d 1122, 1129 (3d Cir. 1988).