130 Nev., Advance Opinion 49

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| CHARLES REESE CONNER,<br>Appellant,<br>vs.<br>THE STATE OF NEVADA,<br>Respondent. | No. 57109<br><br>**FILED**<br><br>JUN 26 2014<br><br>TRACIE K. LINDEMAN<br>CLERK OF SUPREME COURT<br>BY_____<br>CHIEF DEPUTY CLERK |

Appeal from a judgment of conviction, pursuant to a jury verdict, of first-degree murder and two counts of sexual assault. Eighth Judicial District Court, Clark County; Elissa F. Cadish, Judge.

*Reversed and remanded.*

Philip J. Kohn, Public Defender, and Howard Brooks, Deputy Public Defender, Clark County,
for Appellant.

Catherine Cortez Masto, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Pam Weckerly and Nancy Becker, Deputy District Attorneys, Clark County,
for Respondent.

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, CHERRY, J.:

In this appeal, we primarily consider whether the district court committed clear error by overruling appellant Charles Reese Conner's *Batson*[1] objection and allowing the State to exercise a

---

[1]*Batson v. Kentucky*, 476 U.S. 79 (1986).

peremptory challenge against an African-American prospective juror. We also explain the district court's obligation to conduct a sensitive inquiry into all the relevant circumstances before deciding whether the opponent of a peremptory challenge has demonstrated purposeful discrimination by a preponderance of the evidence. After considering all the relevant circumstances and having concluded that it is more likely than not that the State struck at least one prospective juror because of race, we hold that the district court committed clear error in its ruling on Conner's *Batson* objection, and we therefore reverse and remand. Further, we reject Conner's claim that insufficient evidence supports his convictions.

## I.

On the night of June 2, 1985, neighbors heard Beth Jardine enter her Las Vegas apartment with a man. When Jardine and the man walked past the neighbors' apartment, one neighbor testified that he heard "a little chuckle [or laughter] here and there." Later that night they heard what they believed to be cupboard doors banging around. When one neighbor went down to the laundry room, he noticed that Jardine's front door was ajar. The next day, a maintenance man found Jardine's nude body inside the bedroom of her apartment. She had been bludgeoned to death. After Jardine's body was transported to the Clark County Medical Examiner's Office, a crime scene investigator for the Las Vegas Metropolitan Police Department (Metro) took swabs from the victim's anal and vaginal openings. After forensic tests eliminated Metro's prime suspect, the case went cold.

In 2004, a detective from Metro's Cold Case Unit asked the Las Vegas crime lab to conduct a DNA analysis on the swabs. Two years later, the test was performed and the DNA profile from the vaginal swab

was entered into the Federal Bureau of Investigation's Combined DNA Index System (CODIS). On March 2, 2007, the detective received a report indicating that the CODIS database had matched the DNA profile from the vaginal swab to Conner's DNA profile. Conner's fingerprints were then compared to those recovered from an artist lamp and bed sheet found in the apartment and determined to match.

Later that month, detectives traveled to Arkansas to confront Conner with evidence that his DNA was found inside Jardine and his fingerprints were found at the crime scene. The interview was recorded after Conner waived his Miranda[2] rights. Conner initially denied any knowledge of the incident, telling detectives that he was drunk most of his time in Las Vegas and he did not remember much. He eventually confessed and told detectives that he hit Jardine with a hammer in a blind rage after he just snapped. At that time, detectives had not told Conner that the weapon used was a hammer. Conner also told detectives that he remembered having sex with Jardine and had anal sex with her after he struck her with the hammer. Conner was charged with one count of open murder and two counts of sexual assault by vaginal and anal penetration.

At trial, Conner admitted that he murdered Jardine but contended that it was not premeditated or committed during the perpetration of sexual assault because the sex was consensual. The State called Dr. Alane Olson, a medical examiner in the Clark County Office of the Coroner/Medical Examiner. She testified to another medical examiner, Dr. James Clark's, findings as memorialized in his 1985 autopsy report as well as her own conclusions based on the autopsy report

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

and photographs taken during the autopsy. Dr. Olson testified that based on her review of the autopsy report and photographs, Jardine had between 20 and 25 separate injuries to her head and neck. She was also asked to relay Dr. Clark's opinion as to the cause of death as contained in the autopsy report. Dr. Olson testified that it was Dr. Clark's opinion that the manner of death was homicide, caused by "[c]erebral lacerations and hemorrhage due to fragmented and depressed skull fractures, due to heavy multiple blunt force trauma to [the] head." She also testified to Dr. Clark's opinion that there was, "[a]nal and vaginal sexual intercourse, probable rape." Other findings made by Dr. Clark were also introduced through Dr. Olson's testimony, including that a grid like pattern associated with the injury appeared to be the same pattern present on the end of the hammer that was discovered at the crime scene, there was an area of bruising near the posterior fourchette of the vagina, and sperm was present on the vaginal and anal swabs taken from Jardine before the autopsy.

After hearing all the evidence, a jury rendered a special verdict of guilty against Conner for two counts of sexual assault (vaginal and anal penetration), and one count of first-degree murder, based on both premeditated and felony murder, and sentenced him to death.

## II.

Conner contends that the State presented insufficient evidence to sustain his convictions for first-degree murder and two counts of sexual assault. *See* NRS 200.030(1)(a) and (b); NRS 200.366(1). He argues that the State failed to prove beyond a reasonable doubt that the sexual intercourse was not consensual or that the murder was "willful, deliberate and premeditated." We disagree.

"The Due Process Clause of the United States Constitution requires that an accused may not be convicted unless each fact necessary to constitute the crime with which he is charged has been proven beyond a reasonable doubt." *Rose v. State*, 123 Nev. 194, 202, 163 P.3d 408, 414 (2007). To determine whether due process requirements are met, "[t]he standard of review in a criminal case is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "In assessing a sufficiency of the evidence challenge, 'a reviewing court must consider all of the evidence admitted by the trial court, *regardless whether that evidence was admitted erroneously.*'" *Stephans v. State*, 127 Nev. ___, ___, 262 P.3d 727, 734 (2011) (emphasis in original) (quoting *McDaniel v. Brown*, 558 U.S. 120, 131 (2010)).

When all of the evidence is viewed in the light most favorable to the prosecution, a rational juror could conclude that nonconsensual anal and vaginal penetration occurred and that Conner deliberately and with premeditation intended to kill Jardine by repeatedly striking her in the head with the hammer. "[I]t is the jury's function, not that of the court, to assess the weight of the evidence and determine the credibility of witnesses," and "a verdict supported by substantial evidence will not be disturbed by a reviewing court." *McNair*, 108 Nev. at 56, 825 P.2d at 573; *see also Buchanan v. State*, 119 Nev. 201, 217, 69 P.3d 694, 705 (2003) (explaining that circumstantial evidence alone may sustain a conviction).

SUPREME COURT OF NEVADA

(O) 1947A

Even where, as here, there was sufficient evidence to sustain a conviction, that conviction cannot stand where the State engages in discriminatory jury selection. *See Diomampo v. State*, 124 Nev. 414, 423, 185 P.3d 1031, 1037 (2008) (explaining that discriminatory jury selection in violation of *Batson* constitutes structural error that requires reversal). "The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community." *Batson v. Kentucky*, 476 U.S. 79, 87 (1986). "That is, the very integrity of the courts is jeopardized when a prosecutor's discrimination invites cynicism respecting the jury's neutrality, and undermines public confidence in adjudication." *Miller-El v. Dretke*, 545 U.S. 231, 238 (2005) (citation and internal quotation marks omitted). Discriminatory jury selection is particularly concerning in capital cases where each juror has the power to decide whether the defendant is deserving of the ultimate penalty, death.

## A.

At the beginning of Conner's trial, the district court held four days of voir dire narrowing the venire to 32 prospective jurors who survived the for-cause challenges. The State exercised nine peremptory challenges, using six of them to strike minority members of the remaining venire. Conner alleged that these challenges established a pattern of racial discrimination. In response to this allegation, the State provided race-neutral reasons for the six peremptory challenges. The State argued that all of the veniremembers it struck were "weak on penalty" and explained:

> Every single one of these jurors, . . . each one of
> them indicated either [1] they couldn't imagine a

 

scenario where the death penalty would be appropriate or [2] they flat out switched their questions from what was in their questionnaire where they said they couldn't consider the death penalty and all of a sudden had a change of heart. And those are the reasons, and those are race neutral reasons. . . . That's the basis we used for all those jurors.

Conner argued that these general explanations for striking all six prospective jurors were insufficient and specifically pointed to prospective juror number 157, an African American who expressed no reservations about imposing the death penalty in both his questionnaire and during voir dire. Conner also argued that the State should address its reasons as to each prospective juror individually. The district court relented: "Okay. Do you know what? I'm not paying extra fees for my kid to be at daycare after 6:00 o'clock. So now let's go through it quickly." The State then addressed each of the six challenged veniremembers individually. Without giving Conner an opportunity to respond and without making specific findings as to each challenged veniremember, the district court concluded, "I don't think those explanations given are a pretext for such discrimination, so I'm denying the *Batson* challenge based on that." The jury was then immediately sworn in.

Conner contends that the district court erred by denying his *Batson* challenge because the State's general explanations for striking four of the six veniremembers were not supported by the record and were pretext for racial discrimination. The State does not respond to this contention other than stating that the general explanation was "race neutral and appropriate" and instead focuses on the individual explanations for striking each juror by criticizing Conner for failing to challenge these individual explanations as pretextual during jury

selection. Having considered all the circumstances surrounding Conner's *Batson* claim, we conclude that the district court clearly erred.

## B.

An equal-protection challenge to the exercise of a peremptory challenge is evaluated using the three-step analysis set forth by the United States Supreme Court in *Batson. Kaczmarek v. State*, 120 Nev. 314, 332, 91 P.3d 16, 29 (2004); *see also Purkett v. Elem*, 514 U.S. 765, 767 (1995) (summarizing the three-step *Batson* analysis). First, "the opponent of the peremptory challenge must make out a prima facie case of discrimination." *Ford v. State*, 122 Nev. 398, 403, 132 P.3d 574, 577 (2006). Next, "the production burden then shifts to the proponent of the challenge to assert a neutral explanation for the challenge," *id.*, that is "clear and reasonably specific," *Purkett*, 514 U.S. at 768 (internal quotations omitted). Finally, "the trial court must then decide whether the opponent of the challenge has proved purposeful discrimination." *Ford*, 122 Nev. at 403, 132 P.3d at 577. "This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Rice v. Collins*, 546 U.S. 333, 338 (2006) (internal quotation marks omitted). We review the district court's ruling on the issue of discriminatory intent for clear error. *See Libby v. State*, 115 Nev. 45, 55, 975 P.2d 833, 839 (1999). In this case, we only address the third step of the *Batson* inquiry because, as the State admits, the district court's decision at step one is moot, *see Hernandez v. New York*, 500 U.S. 352, 359 (1991), and Conner does not argue that the State's explanations for striking the prospective jurors were facially discriminatory, *see Purkett*, 514 U.S. at 768 (explaining that "[u]nless a

discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral" at step two (internal quotation marks omitted)).

As we recently discussed in our opinion in *Hawkins v. State*, the defendant bears a heavy burden in demonstrating that the State's facially race-neutral explanation is pretext for discrimination. 127 Nev. ___, ___, 256 P.3d 965, 967 (2011). In order to carry that burden, the defendant *must* offer some analysis of the relevant considerations which is sufficient to demonstrate that it is more likely than not that the State engaged in purposeful discrimination. These relevant considerations include, but are not limited to: (1) the similarity of answers to voir dire questions given by veniremembers who were struck by the prosecutor and answers by those veniremembers of another race or ethnicity who remained in the venire, (2) the disparate questioning by the prosecutors of struck veniremembers and those veniremembers of another race or ethnicity who remained in the venire, (3) the prosecutors' use of the "jury shuffle," and (4) "evidence of historical discrimination against minorities in jury selection by the district attorney's office." *Id.* at ___, 256 P.3d at 967. "An implausible or fantastic justification by the State may, and probably will, be found to be pretext for intentional discrimination." *Ford*, 122 Nev. at 404, 132 P.3d at 578.

Although we explained the defendant's obligation in *Hawkins*, we did not emphasize the important role that the district court plays at step three of the *Batson* inquiry. "[T]he trial court has a duty to assess whether the opponent of the strike has met its burden to prove purposeful discrimination." *United States v. McAllister*, 693 F.3d 572, 580 (6th Cir. 2012). The answer to the decisive question about whether the race-

neutral explanation for a peremptory challenge should be believed will largely turn on an evaluation of credibility and usually will involve an evaluation of the demeanor of the jurors and the attorney who exercises the challenge. *See Hernandez*, 500 U.S. at 365. "The proffer of various faulty reasons and only one or two otherwise adequate reasons, may undermine the prosecutor's credibility to such an extent that a court should sustain a *Batson* challenge." *Lewis v. Lewis*, 321 F.3d 824, 831 (9th Cir. 2003). "[A]n adequate discussion of the district court's reasoning may be critical to our ability to assess the district court's resolution of any conflict in the evidence regarding pretext." *Kaczmarek*, 120 Nev. at 334, 91 P.3d at 30.

The district court "must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available" and "consider all relevant circumstances" before ruling on a *Batson* objection and dismissing the challenged juror. *Batson*, 476 U.S. at 93, 96 (internal quotation marks omitted); *see also Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). This sensitive inquiry certainly includes giving the defendant an opportunity to "traverse an ostensibly race-neutral explanation for a peremptory challenge as pretextual." *Hawkins*, 127 Nev. at ___, 256 P.3d at 967; *Coombs v. Diguglielmo*, 616 F.3d 255, 264 (3d Cir. 2010) ("*Batson* requires . . . an opportunity for opposing counsel to argue that the proffered reasons are pretextual . . . ."). A district court may not unreasonably limit the defendant's opportunity to prove that the prosecutor's reasons for striking minority veniremembers were pretextual. *See Coombs*, 616 F.3d at 263. The district court should sustain the *Batson* objection and deny the peremptory challenge if it is "more likely than not that the challenge was improperly motivated." *Johnson v. California*, 545

SUPREME COURT
OF
NEVADA

(O) 1947A

U.S. 162, 170 (2005); *see also Williams v. Beard*, 637 F.3d 195, 215 (3d Cir. 2011).

## C.

We turn then to the inquiry that was conducted at step three in this case. Although Conner challenges on appeal the district court's decision during step three with respect to four of the prospective jurors, we need only consider one of them here. *See Snyder*, 552 U.S. at 478 (explaining that clear error with respect to one juror is sufficient for reversal); *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994) ("[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose."). As discussed above, two general explanations were offered by the State for striking all of the challenged veniremembers: (1) they "switched their [answers] from what was in their questionnaire" or (2) they "couldn't imagine a scenario where the death penalty would be appropriate." Conner challenged these race-neutral explanations with respect to prospective juror 157, a United States Air Force Reserve officer, who worked full-time as a correctional officer and formerly served as a naval officer and police officer in another state. Conner reminded the district court that this prospective juror told both parties during voir dire that he could consider all three forms of punishment and was not concerned about his ability to impose the death penalty. His exact answer to the question, "do you feel as though you could, if necessary, vote to impose the ultimate punishment of the death penalty" was "I could sir." Furthermore, a review of his answers during voir dire reveals that he did not switch any of his answers from what he wrote on his questionnaire. Thus, the State's general explanations for striking this prospective juror

SUPREME COURT
OF
NEVADA

(O) 1947A

11

were belied by the record. A race-neutral explanation that is belied by the record is evidence of purposeful discrimination.

Without responding to Conner's allegation of pretext, the district court asked the State to provide a more specific explanation for striking each of the six challenged veniremembers. Five of the six individual explanations provided further details about how each of them (1) switched answers or (2) "couldn't imagine a scenario where the death penalty would be appropriate." Juror 157 was the exception. The State abandoned its two general explanations for striking him and produced two new explanations. Instead of giving Conner an opportunity to respond to these new explanations, the district court judge overruled Conner's objections, swore in the jury, and left the courtroom after briefly reassuring the parties that she had listened "to the six separate explanations and [that her] ruling was based on those." We conclude that the district court failed to meet its step-three obligations. At the very least, the district court should have provided Conner an opportunity to meet his burden by responding to the individual race-neutral explanations proffered by the State. Without doing so, the district court could not undertake the sensitive inquiry into all the relevant circumstances required by *Batson* and its progeny. *See Batson*, 476 U.S. at 93, 96.

On appeal, the State asks this court to overlook the evidence of purposeful discrimination and focus on the new race-neutral explanations for striking prospective juror 157 that were not belied by the record. We find it "difficult to credit the State's new explanation, which reeks of afterthought." *Miller-El v. Dretke*, 545 U.S. 231, 246 (2005) (describing the State's sudden production of a new explanation and failure to defend its first explanation after defense counsel drew attention to its

misstatement). Moreover, the State's new race-neutral explanations do not instill this court with confidence in the district court's rushed decision below. The State's first new explanation was that it feared the prospective juror would influence others in the jury room because of his knowledge of law enforcement and the criminal justice system. While not necessarily "[a]n implausible or fantastic justification," *Ford*, 122 Nev. at 404, 132 P.3d at 578, we find it unusual that the State based its decision on this prospective juror's law enforcement experience, especially in light of his promise during voir dire, at the State's request, that he would follow the instructions of the district court about the law. The second new explanation for striking this prospective juror was that he believed people could be redeemed or rehabilitated. If, indeed, prospective juror 157's thoughts on redemption or rehabilitation made the State uneasy, it also should have been worried about a number of other veniremembers whom it accepted with no evident reservations. *Miller-El*, 545 U.S. at 244. A comparison of prospective juror 157's responses to those of other veniremembers who were not struck reveals that his expressed views on redemption or rehabilitation were similar, if not identical, to those of at least three other non-African-American veniremembers who remained on the jury. This kind of disparate treatment of similarly situated veniremembers can support the inference that the reasons given for striking prospective juror 157 were mere pretext for purposeful discrimination. *See id.* at 244-47. Having considered all the relevant circumstances, we conclude that the district court clearly erred by allowing the State to exercise a peremptory challenge to dismiss this prospective juror.

Because this error is structural, we reverse the judgment of the district court and remand this matter to the district court for proceedings consistent with this opinion.[3]

_____, J.
Cherry

We concur:

_____, J.
Pickering

_____, J.
Hardesty

_____, J.
Parraguirre

_____, J.
Douglas

_____

[3]Because we reverse the judgment of conviction on these grounds we need not address the other contentions raised by Conner on appeal.

GIBBONS, C.J., with whom SAITTA, J., agrees, concurring:

While I agree with the majority that the district court clearly erred by denying Conner's *Batson* challenge, I write separately to express my concern with the State's introduction of the statements and opinions of Dr. James Clark as contained in his 1985 autopsy report through the testimony of Dr. Alane Olson. In its answering brief, the State argues that an autopsy report is not testimonial because it falls within the business-records exception to the hearsay rule. The United States Supreme Court has clearly explained that whether a report falls within an exception to the hearsay rule is not determinative of whether the report is testimonial. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 322-24 (2009). This court has "previously concluded that a statement is testimonial if it would lead an objective witness to reasonably believe that the statement would be available for use at a later trial." *Vega v. State*, 126 Nev. ___, ___, 236 P.3d 632, 637 (2010) (internal quotations omitted); *see also Davis v. Washington*, 547 U.S. 813, 822 (2006) (determining whether statement was made for the primary purpose of establishing "past events potentially relevant to later criminal prosecution"); *Williams v. Illinois*, 567 U.S. ___, ___, 132 S. Ct. 2221, 2261 (2012) (Thomas, J., concurring in judgment) (agreeing with the primary purpose analysis of Kagan, Scalia, Ginsburg, and Sotomayor, JJ.). Furthermore, the Sixth Amendment prohibits the State from introducing testimonial evidence through "surrogate testimony." *Bullcoming v. New Mexico*, 564 U.S. ___, ___, 131 S. Ct. 2705, 2710 (2011); *Vega*, 126 Nev. at ___, 236 P.3d at 638 (concluding that an expert witness's testimony regarding the content of a written report prepared by another person who did not testify "effectively

admitted the report into evidence"). In the event of a retrial, the State should carefully consider the Confrontation Clause issues.

_____, C.J.
Gibbons

I concur:

_____, J.
Saitta