LIU, J., Dissenting.
The court today affirms a judgment of death that followed a trial in which the prosecutor used peremptory strikes to remove the first five black women in the jury box. Defendant, who is black, was charged with robbery and murder, and the principal defense witness was a black woman, defendant’s wife. When the trial judge asked the prosecutor to state his reasons for striking the five black female jurors, the prosecutor said he believed each of them would be hesitant to impose the death penalty. The prosecutor gave vague explanations for his belief, stating that it was “just my general impression from their answers ... in spite of what they said,” “[i]t was my general impression from the way she answered the questions, not what she said,” and “sometimes you get a feel for a person that you just know that they can’t impose it based upon the nature of the way that they say something.” The trial judge accepted the prosecutor’s explanations despite the fact that she had “stopped taking notes” by the time at least two of these prospective jurors were questioned and thus could “only go by what [the prosecutor] is saying.” In the course of ruling on one of defendant’s Batson claims (Batson v. Kentucky (1986) 476 U.S. 79, 96 [90 L.Ed.2d 69, 106 S.Ct. 1712]), the trial judge said she had noticed in past cases that “. . . Black women are very reluctant to impose the death penalty; they find it very difficult no matter what it is.” The prosecutor ultimately accepted a jury that included one black woman, and the jury convicted defendant of murder and returned a penalty verdict of death.
*700 My colleagues conclude that the trial court did not err, “ ‘giv[ing] great deference to the trial court’s ability to distinguish bona fide reasons from shani excuses.’ ” (Maj. opn., ante, at p. 650.) But deference in these circumstances all but drains the constitutional protection against discrimination in jury selection of any meaningful application. Here the prosecutor relied largely on vague references to the jurors’ demeanor; the trial judge, who had “stopped taking notes,” had no way to independently evaluate the prosecutor’s explanations; and the trial judge gave no legitimate reason for finding the prosecutor or his explanations to be credible. This record provides no basis for deferring to the trial court’s acceptance of the prosecutor’s explanations, for there is no indication that the trial court made a sincere and reasoned effort to evaluate “all of the circumstances that bear upon the issue” of purposeful discrimination. (Snyder v. Louisiana (2008) 552 U.S. 472, 478 [170 L.Ed.2d 175, 128 S.Ct. 1203] (Snyder); see Miller-El v. Dretke (2005) 545 U.S. 231, 239 [162 L.Ed.2d 196, 125 S.Ct. 2317] (Miller-El); Batson v. Kentucky, supra, 476 U.S. at p. 96 (Batson).) The upshot of this erroneous application of deference is the denial of defendant’s Batson claim despite the fact that no court, trial or appellate, has ever conducted a proper Batson analysis.
Today’s decision deepens a split of authority among federal and state appellate courts on the adequacy of a Batson ruling where the trial court has engaged in no explicit analysis of the validity of the prosecutor’s facially neutral explanation. Some cases have held that a trial court’s denial of a Batson challenge, by itself, constitutes an implicit finding at the third step of the Batson analysis that the prosecutor’s explanation was credible; these cases accord deference to this implicit finding. (See, e.g., Edwards v. Roper (8th Cir. 2012) 688 F.3d 449, 457; Messiah v. Duncan (2d Cir. 2006) 435 F.3d 186, 198; State v. Angelo (2008) 287 Kan. 262 [197 P.3d 337, 347].) Other cases have held that when a trial court has not provided any explicit analysis of the credibility of a prosecutor’s explanation, a reviewing court has no basis for deferring to the trial court’s ruling at Batson’s third step. (See, e.g., U.S. v. McAllister (6th Cir. 2012) 693 F.3d 572, 581; U.S. v. Rutledge (7th Cir. 2011) 648 F.3d 555, 558-559; Coombs v. Diguglielmo (3d Cir. 2010) 616 F.3d 255, 261-265; Green v. LaMarque (9th Cir. 2008) 532 F.3d 1028, 1031.) Our court has aligned itself with one side of this split, but not the side that reflects the United States Supreme Court’s teachings on the careful scrutiny that trial courts and reviewing courts must apply to ferret out unlawful discrimination in jury selection—a harm that “compromises the right of trial by impartial jury,” perpetuates “ ‘group stereotypes rooted in, and reflective of, historical prejudice,’ ” and “undermines public confidence in adjudication.” (Miller-El, supra, 545 U.S. at pp. 237-238.) Because the goal of extirpating such discrimination cannot be reconciled with deference to a trial court’s Batson ruling when there is no indication that the trial court conducted the inquiry *701 necessary to support that ruling, and because the totality of circumstances here gives rise to a strong inference of unlawful discrimination, I respectfully dissent.
I.
Defendant was charged with robbing and murdering two men in South Central Los Angeles after a fraudulent drug transaction went awry. Defendant’s wife, who is black, was the principal witness for the defense and attempted to shift the blame for the murders to defendant’s accomplices.
The case was tried in Compton. Jury selection took place in August and September of 1991, a few months after the nationally televised police beating of Rodney King, a black man, had escalated racial tensions in Los Angeles. The trial court referred to these events during voir dire, asking prospective jurors: “Is there anyone here who feels because of the Rodney King case that it’s affected you to -a point where you would not be able to impartially listen to the testimony of a police officer?”
After the prosecutor used peremptory challenges to strike the first three black women seated on the jury panel, defendant raised an objection pursuant to Batson and People v. Wheeler (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]. While observing that “I did have some of [these three jurors] marked that I expected to be exercised on,” the trial court asked the prosecutor to give reasons for these challenges. The prosecutor said each of the jurors had “demonstrated a reluctance in terms of answering direct questions which called for the requirement of the imposition of the death penalty with an affirmative answer that they would impose it. They would either say, well, I think I might be able to, or I could, but their reluctance to impose it was evident not only from the answers they gave from the time that it took them to respond to the question, their general demeanor in answering the questions, and my impression from each of them.” He continued: “It was just my general impression from their answers that in spite of what they said, they wouldn’t have the ability to impose it when it actually came down to it. That is my reasons [sz'c] for excusing them.” After briefly hearing additional arguments from both parties, the trial court simply stated: “The motion is denied.”
The prosecutor used another peremptory challenge to strike the next black woman seated in the jury box, Prospective Juror R.P. Defendant made a second Batson/Wheeler objection, and the trial court again directed the prosecutor to explain. The prosecutor said he struck R.P. for the same reason he struck the prior three black women; he had marked R.P. very low on a scale he used to rate a juror’s willingness to impose the death penalty. The *702 trial court said it did not recall whether R.P. had displayed any such hesitation. The court went on to say that although it had made notes on certain jurors who appeared to be reluctant to impose the death penalty, “I stopped making marks after a point. I’m sorry that I did that but at this point I did forget to.”
During a recess, the prosecutor reviewed the reporter’s transcript of the voir dire of R.P. and his own notes. He read portions of the transcript to the court, highlighting an exchange in which R.P. said that she had not “pinned . . . down” when the death penalty would serve as a deterrent and that “[wjith some people it would and with some people it probably would not.” Defense counsel questioned whether these responses indicated that R.P. would be reluctant to impose the death penalty. The prosecutor, agreeing that the answers themselves did not show R.P. to be reluctant, explained: “It was just my impression she didn’t have the ability in spite of what her answers were. It had a lot more to do with not what she said but how I read what she was saying from being present in court with her and observing her demeanor and the way she answered questions. It clearly isn’t from the words that are written down. It was my general impression from the way she answered the questions, not what she said.”
The trial court then denied the Batson/Wheeler motion: “And I’m going to say that there is sufficient explanation on [R.P.] [f] As I indicated earlier, I had made notes on some of them and that was by their demeanor and their manner of responding. I don’t have anything on this one at this time, but I would accept [the prosecutor’s] explanation as to his exercise of the peremptory, so I would not make a finding that there is a Wheeler violation.”
Thereafter, when the prosecutor struck the fifth black woman seated in the jury box, Prospective Juror R.J., defendant made his third Batson/Wheeler objection. At sidebar, defense counsel argued that this strike was particularly suspicious because the prosecutor had previously accepted a jury panel that included R.J. The prosecutor explained: “I did accept her because the composition was somewhat satisfactory to me. . . . [f] I was somewhat reluctant to kick her out of fear of making a Wheeler motion. . . . Additionally I was a little more concerned about offending the Blacks on the jury for them thinking I was making the same—doing the same thing. But I went down to my office and thought about it, and it doesn’t make any sense to me to go through this entire process with a juror that I honestly don’t believe because of her responses and the way she answered me during the individual voir dire, it doesn’t make sense to me to try this case in front of that person when I think going in they don’t have the ability to render a death verdict if that’s what the case calls for. [I] . . . [I]f that means excusing her because she was rated as being low for her inability to impose the death *703 penalty then that’s what I’m going to do. It has nothing to do with the color of her skin. I can’t emphasize that enough. It has to do with her responses.”
At this point, the trial court inteqected: “I don’t recall her responses at all.” The prosecutor then explained further: “It is my impression not only from her answers to the questions but her demeanor and the fashion in which she answered them, I don’t think she can impose the death penalty on any case. It doesn’t matter the circumstances regardless, [f] I don’t know how to exactly express it for the record.” He continued: “But sometimes you get a feel for a person that you just know that they can’t impose it based upon the nature of the way that they say something.”
After hearing argument from defense counsel, the trial court said: “I have to say in my other death penalty cases I have found that the Black women are very reluctant to impose the death penalty; they find it very difficult no matter what it is. I have found it to be true, [f] But as I said I cannot say anything about these. I can only go by what [the prosecutor] is saying because I stopped making notes . . . .” The court then added: “I am just making a little point. I just wanted to tell you my observation that I have seen this before and I can understand why. That’s why. But I am not making my ruling based on that.” When defense counsel pointed out that it would be improper to base a ruling on such a rationale, the trial court said: “Of course it is improper. I am just giving it for your information, what I have observed.” The court then rejected defendant’s motion, stating only: “And at this point I will accept [the prosecutor’s] explanation.”
Immediately following this hearing at sidebar, the prosecution said to the prospective jurors in open court: “It is not a mystery at all, you now. Everybody here, everybody recognizes when we go up to the bench after I kick a female Black, for example, a number of times we’re up there talking about the fact that I’m doing that.” He explained that he had struck these jurors because of their beliefs regarding the death penalty.
Ultimately, the prosecutor exercised 17 peremptory challenges, 13 of which were directed at women, including the five black women discussed above. After the 12 seated jurors had been selected, the prosecutor at sidebar referred again to defense counsel’s Batson/Wheeler motions, stating for the record: “First of all, I would like to indicate the last number of challenges I exercised were against White jurors, to be replaced by Black jurors. The reason they were exercised was, first of all, I wanted a greater mix of racial diversification on this jury. [][] Second, they just happened to be a couple of Black jurors I rated very high because of their answers where they indicated they had an ability to impose the death penalty in a particular case, [f] The racial *704 makeup is five Black and seven Whites. There are four male Blacks and one female Black.” The jury found defendant guilty as charged and returned a penalty verdict of death.
II.
Proper analysis of the trial court’s rulings in this case must proceed from an understanding of applicable high court precedent, beginning with Batson. In Batson, the United States Supreme Court reaffirmed the principle, long recognized since Strauder v. West Virginia (1880) 100 U.S. 303 [25 L.Ed. 664], that “[p]urposeful racial discrimination in selection of the venire violates a defendant’s right to equal protection because it denies him the protection that a trial by jury is intended to secure.” (Batson, supra, 476 U.S. at p. 86.) Although a defendant is not entitled to a jury of any particular racial composition, and “[ajlthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges ‘for any reason at all, as long as that reason is related to his view concerning the outcome’ of the case to be tried, [citation], the .Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that Black jurors as a group will be unable impartially to consider the State’s case against a Black defendant.” (Id. at p. 89.) The high court observed that violations of this constitutional principle implicate not only the fairness of individual trials but also our system of criminal justice more broadly: “The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude Black persons from juries undermine public confidence in the fairness of our system of justice.” (Id. at p. 87.)
Before Batson, the high court in Swain v. Alabama (1965) 380 U.S. 202 [13 L.Ed.2d 759, 85 S.Ct. 824] had considered the evidentiary burden that a defendant must meet in order to prove racial discrimination in jury selection. Swain had been interpreted to hold that a defendant may establish a prima facie case of purposeful discrimination only by showing that in case after case the prosecution had systematically excluded black prospective jurors. (See id. at pp. 223-224.) Because this “crippling burden of proof’ had rendered “prosecutors’ peremptory challenges . . . largely immune from constitutional scrutiny” (Batson, 476 U.S. at pp. 92-93), the high court in Batson reformed the inquiry used to assess whether the prosecution had exercised a peremptory strike in a racially discriminatory manner.
Batson set forth a three-stage inquiry that is now familiar. First, a defendant must make out a prima facie case by pointing to facts that raise the inference that the prosecution has engaged in impermissible discrimination. (Batson, supra, 476 U.S. at pp. 96-97.) In determining whether the defendant *705 has raised such an inference, the court must consider “all relevant circumstances,” including whether the prosecution has engaged in a “ ‘pattern’ of strikes” against jurors of a particular race or has made statements during voir dire or in exercising his challenges that “may support or refute an inference” of discrimination. (Ibid.) Second, once the defendant has made a prima facie showing, the burden shifts to the prosecution “to come forward with a neutral explanation for challenging” these jurors. (Id. at p. 97.) While “the prosecutor’s explanation need not rise to the level justifying exercise of a challenge for cause” (ibid.), the prosecutor “must articulate a neutral explanation related to the particular case to be tried” and may not “rebut the defendant’s case merely by denying that he had a discriminatory motive or ‘affirming] [his] good faith in making individual selections.’ [Citation.]” (Id. at p. 98.) Finally, at the third step, the court must determine whether “the defendant has established purposeful discrimination.” (Ibid.) A Batson motion will be granted if “it was more likely than not that the challenge was improperly motivated.” (Johnson v. California (2005) 545 U.S. 162, 170 [162 L.Ed.2d 129, 125 S.Ct. 2410] (Johnson); see Williams v. Beard (3d Cir. 2011) 637 F.3d 195, 215 [“At step three of the Batson analysis, the petitioner must show that ‘it is more likely than not that the prosecutor struck at least one juror because of race.’ ”].)
After Batson, the high court in J. E. B. v. Alabama ex rel. T. B. (1994) 511 U.S. 127 [128 L.Ed.2d 89, 114 S.Ct. 1419] (J. E. B.) held that “the Equal Protection Clause forbids intentional discrimination on the basis of gender, just as it prohibits discrimination on the basis of race.” (Id. at p. 129.) “All persons, when granted the opportunity to serve on a jury, have the right not to be excluded summarily because of discriminatory and stereotypical presumptions that reflect and reinforce patterns of historical discrimination.” (Id. at pp. 141-142.) The high court observed that because “gender and race are overlapping categories, gender can be used as a pretext for racial discrimination,” and thus “[f] ailing to provide jurors the same protection against gender discrimination as race discrimination could frustrate the purpose of Batson . . . .” (Id. at p. 145; see id. at fn. 18 [noting that the “temptation to use gender as a pretext for racial discrimination may explain why the majority of the lower court decisions extending Batson to gender involve the use of peremptory challenges to remove minority women”].)
In more recent years, the high court has refined the Batson inquiry to better effectuate the constitutional protection against unlawful discrimination in jury selection. Because the trial court in Batson had rejected the defendant’s claim without even requiring the prosecution to explain its strikes, Batson had no occasion to examine how a court should assess whether purposeful discrimination has been proven at the third step of the analysis. (See Batson, supra, 476 U.S. at p. 98.) Since Batson, the high court has addressed this question in Miller-El, supra, 545 U.S. 231 and Snyder, supra, 552 U.S. 472. Those cases *706 demonstrate the careful analysis of all relevant circumstances that trial courts and appellate courts must apply in assessing the validity of the prosecution’s stated reasons for striking a juror and in ultimately determining whether the defendant has proven purposeful discrimination.
In Miller-El, the Supreme Court granted the federal habeas corpus petition of a Texas death row inmate where the prosecution had used peremptory challenges to remove 10 black venire members, leaving one black juror. (Miller-El, supra, 545 U.S. at pp. 236, 240.) The prosecution had offered race-neutral explanations for each of these challenges, the trial court had accepted those explanations, and the Texas Court of Criminal Appeals had affirmed. (Id. at pp. 236-237.) Because petitioner’s Batson claim had been rejected on the merits by the Texas courts, the high court could grant relief under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA; Pub.L. No. 104-132 (Apr. 24, 1996) 110 Stat. 1214) only if petitioner could rebut by “ ‘clear and convincing evidence’ ” the Texas courts’ presumptively correct factual finding that the prosecution had not engaged in impermissible racial discrimination. (Miller-El, at p. 240, quoting 28 U.S.C. § 2254(e)(1).)
Even under this deferential standard of review, the high court in Miller-El granted habeas corpus relief, applying a careful and comprehensive Batson stage three analysis of the prosecution’s peremptory challenges. The high court first observed that the sheer number of strikes the prosecution had used against black panelists provided grounds to believe that the prosecution had discriminated on the basis of race. (Miller-El, supra, 545 U.S. at pp. 240-241.) Then, in order to determine whether the facially neutral reasons given by the prosecutor were false or pretextual, the high court engaged in a detailed comparative juror analysis. “If a prosecutor’s proffered reason for striking a Black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson’s third step.” (Id. at p. 241.)
Focusing on two black jurors whom the prosecution claimed to have struck because of their statements regarding the death penalty, the high court in Miller-El found that the statements of the two jurors were comparable to those of a number of venire members whom the prosecution did not strike, including some who ultimately served on the jury and others who were accepted by the prosecution but struck by the defense. (See Miller-El, supra, 545 U.S. at pp. 244-245, 248-249.) Further, the high court rejected outright another of the prosecution’s stated reasons for striking one of the two black jurors as mere “makeweight” because it was proffered only after defense counsel had called into question the prosecution’s originally stated reason. (Id. at p. 246.) Finally, the high court highlighted a number of other facts that *707 were suggestive of discrimination: the prosecution had “shuffled” the venire panel in a manner that would make it less likely for black panelists to serve on the jury (id. at pp. 253-254), the prosecution had posed different voir dire questions to black and non-black panel members (id. at pp. 255-263), and the county prosecutor’s office had employed a policy of striking black prospective jurors for decades prior to the trial (id. at pp. 263-264). Upon considering all of these circumstances, Miller-El held: “The state court’s conclusion that the prosecutors’ strikes of [these two jurors] were not racially determined is shown up as wrong to a clear and convincing degree; the state court’s conclusion was unreasonable as well as erroneous.” (Id. at p. 266.)
The Supreme Court conducted a similarly careful inquiry in Snyder, a capital case where the prosecution had used peremptory challenges to strike all five black prospective jurors who could have served on the jury. (Snyder, supra, 552 U.S. at p. 476.) The high court focused on the prosecution’s proffered reasons for striking one of these five jurors, Mr. Brooks. (See id. at p. 478 [“ ‘[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose’ ” (quoting U.S. v. Vasquez-Lopez (9th Cir. 1994) 22 F.3d 900, 902)].) The prosecution had given two reasons for striking Mr. Brooks: first, he appeared to be nervous during voir dire, and second, he might vote to convict the defendant of a lesser crime in order “ ‘to go home quickly’ ” and attend to his obligations as a student teacher. (Snyder, at p. 478.) The trial court had allowed the prosecutor’s challenge to Mr. Brooks without explanation. (Ibid.)
Snyder concluded that the trial court committed clear error in rejecting the defendant’s Batson objection to the strike of Mr. Brooks. (Snyder, supra, 552 U.S. at p. 474.) As to the prosecutor’s first reason for the strike, the high court acknowledged that “ ‘nervousness cannot be shown from a cold transcript . . .’ ” and that “deference is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike.” (Id. at p. 479.) But the high court emphasized that “[h]ere ... the record does not show that the trial judge actually made a determination concerning Mr. Brooks’ demeanor.” (Ibid.) “It is possible that the judge did not have any impression one way or the other concerning Mr. Brooks’ demeanor. . . . [T]he trial judge may not have recalled Mr. Brooks’ demeanor. Or, the trial judge may have found it unnecessary to consider Mr. Brooks’ demeanor, instead basing his ruling completely on the second proffered justification for the strike. For these reasons, we cannot presume that the trial judge credited the prosecutor’s assertion that Mr. Brooks was nervous.” (Ibid.)
As to the prosecutor’s second proffered reason, the high court observed that the possibility that Mr. Brooks would have been willing or able to tailor *708 the jury’s verdict in order to shorten the duration of trial was “highly speculative” and that the same concerns could have been raised with respect to jurors accepted by the prosecution who had “disclosed conflicting obligations that appear to have been at least as serious” as those of Mr. Brooks. (Snyder, supra, 552 U.S. at pp. 482-483.) The high court concluded that the “prosecution’s proffer of this pretextual explanation naturally [gave] rise to an inference of discriminatory intent.” (Id. at p. 485.) Because the trial court had made no finding on the record as to the prosecution’s demeanor-based reason, and because there was no indication that the prosecution would have challenged Mr. Brooks “based on his nervousness alone” or that this “subtle question of causation could be profitably explored further on remand . . . more than a decade after petitioner’s trial,” the high court reversed the conviction. (Id. at pp. 485-486.)
In Thaler v. Haynes (2010) 559 U.S. 43 [175 L.Ed.2d 1003, 130 S.Ct. 1171] (Haynes), the high court issued a brief per curiam opinion clarifying that Snyder did not hold that a trial court must invariably reject a proffered demeanor-based reason if the trial court had not personally observed the aspect of juror demeanor identified by the prosecution. (Id. at p. 48 [130 S.Ct. at p. 1174].) In Haynes, the Fifth Circuit had relied on Snyder in granting a state prisoner’s federal habeas corpus petition on the ground that the trial judge who had accepted some of the prosecution’s demeanor-based reasons for exercising peremptory challenges was not the same trial judge who had presided during voir dire. (Id. at pp. 44-45 [130 S.Ct. at pp. 1172-1173].) The precise question in Haynes was whether the Fifth Circuit had correctly applied AEDPA’s requirement that such a habeas corpus petition may be granted only if the state court’s decision “ ‘was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.’ ” (Haynes, at p. 47 [130 S.Ct. at p. 1173], quoting 28 U.S.C. § 2254(d)(1).) As the high court has made clear, AEDPA’s deferential standard turns not on the actual merits of a constitutional claim but rather on what the high court itself has explicitly said regarding the constitutional claim. (See Haynes, at p. 47 [130 S.Ct. at p. 1173]; see also Marshall v. Rodgers (2013) 569 U.S. _, _-_ [185 L.Ed.2d 540, 133 S.Ct. 1446, 1450-1451]; Harrington v. Richter (2011) 562 U.S. _,_ [178 L.Ed.2d 624, 131 S.Ct. 770, 786].) Haynes reversed the Fifth Circuit’s decision because “no decision of this Court clearly establishes the categorical rule on which the Court of Appeals appears to have relied ....” (Haynes, at p. 49 [130 S.Ct. at p. 1175].) While noting that “the best evidence of the intent of the attorney exercising a strike is often that attorney’s demeanor,” Haynes remanded for further consideration of whether the state court’s rejection of the petitioner’s Batson claim was nevertheless unreasonable. (Ibid.)
To sum up this review of applicable precedent, the three-step inquiry set forth in Batson eased the “crippling burden of proof’ that Swain had been *709 understood to impose on defendants challenging racially discriminatory strikes. (Batson, supra, 476 U.S. at p. 92.) J. E. B. extended Batson to discrimination in jury selection on the basis of gender. (J. E. B., supra, 511 U.S. at pp. 141-142.) Miller-El made clear the thorough and careful scrutiny of all relevant circumstances that trial and appellate courts must apply at the third step of the Batson analysis in light of the “practical difficulty of ferreting out discrimination in selections discretionary by nature.” (Miller-El, supra, 545 U.S. at p. 238.) Snyder applied this careful scrutiny to invalidate a Batson ruling where the trial court had made no explicit determination as to the validity of the prosecutor’s demeanor-based explanation and where consideration of all relevant circumstances showed that another explanation offered by the prosecution was “highly speculative” and “pretextual.” (Snyder, supra, 552 U.S. at pp. 482, 485.) Although Snyder did not establish any “categorical rule” (Haynes, supra, 559 U.S. at p. 49 [130 S.Ct. at p. 1175]), it is instructive to observe the detailed and expansive analysis at Batson’s third step that the high court undertook in Snyder, as in Miller-El, “even under [a] highly deferential standard of review.” (Snyder, at p. 479; see Miller-El, supra, 545 U.S. at p. 240 [applying AEDPA].) The development of this line of doctrine over the past three decades evinces the high court’s commitment to protecting “the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria.” (Batson, supra, at 479 U.S. at pp. 85-86.)
in.
It remains the case that appellate courts reviewing Batson claims “ordinarily” should accord “great deference” to a trial court’s findings of fact, including any finding as to the ultimate question of whether a strike was racially motivated. (Batson, supra, 476 U.S. at p. 98, fn. 21; see Snyder, supra, 552 U.S. at p. 477; Hernandez v. New York (1991) 500 U.S. 352, 365 [114 L.Ed.2d 395, 111 S.Ct. 1859] (plur. opn.).) It makes good sense that appellate courts should generally defer to such findings; a trial court, unlike an appellate court, is in a position to evaluate the nonverbal demeanor of the jurors who are struck and to assess the credibility of the prosecutor as he or she explains the strikes. (See Snyder, at p. 477 [“determinations of credibility and demeanor lie ‘ “peculiarly within a trial judge’s province . . .” ’ ”].)
There is a split of authority, however, as to how the deference ordinarily accorded to a trial court’s Batson ruling should be reconciled with the obligation of trial courts “to assess the plausibility of [the prosecution’s proffered] reason in light of all evidence with a bearing on it.” (Miller-El, supra, 545 U.S. at p. 252.) This issue has arisen in a number of cases where the trial court, after hearing the prosecutor’s facially neutral explanation for a strike, gave little or no explanation on the record in support of its denial of a Batson challenge. The present case implicates this very issue: the trial court *710 did not make any explicit findings regarding the prosecution’s proffered reasons for striking five black women jurors, nor did it provide any explicit analysis of all relevant circumstances bearing on defendant’s Batson motions. Instead, as to each of the three Batson motions, the trial court either summarily stated that “[t]he motion is denied” or simply asserted that it would “accept” the prosecution’s explanation for the strike. The closest the trial court came to making a specific finding regarding any of the strikes was when it observed that although it could not say “anything” about whether the black women struck were reluctant to impose the death penalty, it had observed in prior cases that “. . . Black women are very reluctant to impose the death penalty . . .”—which of course is not a proper basis for crediting the prosecutor’s explanations for the strikes.
My colleagues nevertheless accord the trial court’s Batson rulings “their usual deference.” (Maj. opn., ante, at p. 652.) Instead of conducting a de novo review of the record to determine “whether it was more likely than not that the challenge was improperly motivated” (Johnson, supra, 545 U.S. at p. 170), today’s opinion applies a form of substantial evidence review. The court presumes that the trial court credited those aspects of the prosecutor’s explanations that cannot be fully evaluated on a cold record (see maj. opn., ante, at pp. 657-658) and affirms the trial court’s rulings on the grounds that the prosecutor’s stated reasons were not “ ‘inherently implausible’ ” and that there is some evidence in the record that “supports” those reasons (id. at p. 653; see id. at pp. 654—663.) As explained below, the court errs and, in so doing, deepens the split of authority regarding the deference owed to a trial court that fails to explicitly engage in the analysis required at Batson’s third step.
A.
On one side of the split, a number of courts have held that where, as here, the trial court does not demonstrate on the record that it has evaluated the prosecutor’s explanation in light of all the circumstances bearing on the issue of purposeful discrimination, the trial court’s denial of a Batson challenge is not entitled to deference.
In U.S. v. Rutledge, supra, 648 F.3d 555 (Rutledge), the prosecutor struck two black jurors and, as to the first juror, explained that he was worried the juror would be biased due to the juror’s stated concern during voir dire that other jurors would not listen to him because he shared the race of the defendant. (Id. at p. 558.) As to the second juror, the prosecutor explained that she appeared agitated and frustrated during voir dire. (Id. at p. 557.) After hearing argument, the district court simply said: “ T think that does it then. Those are both nonracial-related reasons.’ ” (Id. at p. 558.) The court *711 then permitted the two jurors to be excused. (Ibid.) The Seventh Circuit refused to accord any deference to the district court’s denial of defendant’s Batson challenge. Observing that the district court had not made any explicit findings with respect to the credibility of the prosecution’s proffered race-neutral reasons, the court of appeals concluded that “if there is nothing in the record reflecting the trial court’s decision, then there is nothing to which we can defer.” (Id. at p. 559.) The appropriate remedy, the court determined, was to remand the case to allow the district court to fill the “void” created by its failure to make explicit findings. (Id. at p. 557.)
In U.S. v. McAllister, supra, 693 F.3d 572, the Sixth Circuit reached a similar conclusion. At Batson’s second step, the prosecutor claimed to have struck the challenged juror because the juror was unemployed and because his prior service in the military police might lead him to be sympathetic to the defendant, a former FBI agent. (Id. at p. 577.) In response to this explanation, the district court simply said: “ ‘All right.’ ” (Ibid.) The Sixth Circuit observed that “[f]rom a review of the record, it is unclear to what extent the district court engaged in the third step [of the Batson analysis], if it did at all.” (Id. at p. 580.) “The district court did not consult with the defense counsel to hear a response to the Government’s race-neutral explanation, nor did it engage the prosecution to independently assess the plausibility of its argument. [(Miller-El, supra, 545 U.S. at pp. 251-252.)] Gauging from the district court’s two-word analysis and finding—‘all right’—it is doubtful that the district court consulted all circumstances that bear upon the issue of racial animosity. [(Snyder, supra, 552 U.S. at p. 478.)] We have no way of reviewing the district court’s reasoning for rejecting McAllister’s Batson challenge.” (McAllister, at p. 582.) The Sixth Circuit remanded for the district court to make “explicit on-the-record findings as to whether McAllister established the existence of purposeful race discrimination in the selection of his jury.” (Ibid.)
The Third Circuit confronted a similar situation in Coombs v. Diguglielmo, supra, 616 F.3d 255 (Coombs). The prosecutor in Coombs, upon striking two black female jurors from the panel, explained that he struck one because she was an eyewitness to a shooting and because her mother had been robbed, and that he struck the other because her brother had been charged with robbery. (Id. at p. 258.) The state trial court denied the defendant’s Batson motions, stating: “ ‘These are what lawyers do with peremptory challenges. They’re not race-based. ... As long as we have peremptory challenges, lawyers are going to make judgments maybe based on hunches, maybe based on prior experiences, maybe based on feelings, but they’re not based on race. Both of you are much too good lawyers to do something like that.’ ” (Ibid.) The defense made another Batson motion after the prosecutor struck three additional black jurors. The prosecutor explained that one juror’s cousin had been a witness to a robbery and that another juror had a nephew who had *712 been shot, a nephew in jail, and a friend who was a defense attorney. (Ibid.) As to the final juror, the prosecutor said that he “ ‘just didn’t like him’ ” because of the “ ‘way he was looking at me’ ” and added that the juror had failed to “ ‘check off many boxes’ ” on the jury questionnaire. (Ibid.) In response to these explanations, the trial court said, “ ‘Let’s go.’ ” (Ibid.) Defense counsel then asked “ ‘Your Honor is going to accept the Commonwealth’s assertions and deny my motion?’ ” (Ibid.) The trial court responded: “ ‘Yes.’ ” (Ibid.)
The Third Circuit held that the trial court “failed to conduct a full and complete Batson step three analysis.” (Coombs, supra, 616 F.3d at p. 263.) It observed that the trial court had improperly limited defense counsel’s opportunity to respond to the prosecution’s proffered reasons. (Id. at pp. 263, 265.) Furthermore, the trial court had not made “the findings required under Batson.” (Id. at p. 263.) Rather, “[rjelying upon its view of counsel’s competence and/or professionalism, the court failed to inquire into whether the prosecutor’s purported reasons for striking the jurors were pretextual. . . .” (Ibid.) This failure to inquire into the validity of the prosecutor’s reasons was particularly troubling given the prosecutor’s vague explanation for striking the fifth juror. (Id. at pp. 263-264.) Accordingly, the Third Circuit remanded for an evidentiary hearing that would permit the district court to conduct the analysis that the state trial court had apparently failed to conduct in the first instance. (Id. at p. 265.)
In Green v. LaMarque, supra, 532 F.3d 1028, the prosecutor struck six black prospective jurors and offered race-neutral reasons for each strike. The state trial court denied the defendant’s Batson motion without providing any analysis on the record as to whether the prosecution’s proffered reasons were pretextual. (Id. at p. 1030.) The Ninth Circuit concluded that the trial court had “failed to undertake ‘ “a sensitive inquiry into such circumstantial and direct evidence of intent as may be available,” ’ including a comparative analysis of similarly situated jurors.” (Ibid.) The court of appeals rejected the state’s argument that it should “presume the trial court found the prosecution’s race-neutral reasons for striking [one of these jurors] to be genuine when it denied” the defendant’s Batson motion, instead holding that “we must not make such a presumption where ‘the court never fulfilled its affirmative duty to determine if the defendant had established purposeful discrimination.’ ” (Id. at p. 1031.) Accordingly, the Ninth Circuit “conduct[ed] that analysis de novo.” (Ibid.; see McGahee v. Alabama Dept. of Corrections (11th Cir. 2009) 560 F.3d 1252, 1260 [state trial court unreasonably applied clearly established federal law in failing to make a ruling on the credibility of the prosecution’s proffered race-neutral reasons].)
Each of the decisions above declined to accord deference to the trial court’s denial of a Batson claim because the trial court did not demonstrate *713 on the record that it had engaged in the comprehensive inquiry required to make such a ruling at Batson’s third step. A number of state high courts have also followed this approach. (See, e.g., Jones v. State (Del. 2007) 938 A.2d 626, 633-636; People v. Davis (2008) 231 Ill.2d 349 [326 Ill.Dec. 21, 899 N.E.2d 238, 249-250]; Commonwealth v. Rodriguez (2010) 457 Mass. 461 [931 N.E.2d 20, 33]; State v. Pona (R.I. 2007) 926 A.2d 592, 608 [“If this Court is to ensure that a trial justice has properly considered the credibility of each proffered race-neutral reason and has addressed each of a defendant’s arguments that a peremptory strike actually was a pretext for purposeful discrimination, we must be presented with an adequate record to review on appeal.”].)
Other courts, however, have taken a different approach. In Edwards v. Roper, supra, 688 F.3d 449, the prosecutor claimed that he struck one juror because he was a postal worker and might see jury service as an opportunity to “ ‘not follow the rules.’ ” (Id. at p. 456.) In rejecting the defendant’s Batson challenge, the trial court said only: “ ‘[T]he Batson challenge will be denied ....’” (Id. at p. 457.) Before the Eighth Circuit, the petitioner argued that the Missouri Supreme Court had erred in concluding that the trial court had made a factual finding regarding the ultimate question of the prosecutor’s discriminatory intent. (Ibid.) The Eighth Circuit rejected this argument. Relying on circuit precedent, the court said: “The denial of a Batson challenge ... ‘is itself a finding at [Batson’s] third step that the defendant failed to carry his burden of establishing that the strike was motivated by purposeful discrimination,’ [(Smulls v. Roper (8th Cir. 2008) 535 F.3d 853, 863)], and it ‘includes an implicit finding that the prosecutor’s explanation was credible.’ [(Taylor v. Roper (8th Cir. 2009) 577 F.3d 848, 856)].” (Ibid.)
Similarly, the Second Circuit has held that the “unambiguous rejection of a Batson challenge will demonstrate with sufficient clarity that a trial court deems the movant to have failed to carry his burden to show that the prosecutor’s proffered race-neutral reason is pretextual.” (Messiah v. Duncan, supra, 435 F.3d 186, 198.) In Messiah, the prosecutor said he struck a black juror because the juror had a background in social work and because the juror’s wife was a lawyer. (Id. at p. 190.) The trial court, after hearing argument, said only: “ ‘That’s five, five by the People’ ”—a reference to the number of jurors the prosecutor had struck, including the juror who was the subject of the defendant’s Batson motion, and an implicit ruling that the strike would be allowed. (Id. at p. 199.) The Second Circuit held that this statement made it “evident that the trial judge did not discredit or find unpersuasive the prosecution’s race-neutral explanations” and thus constituted “a succinct but adequate Batson ruling” entitled to “ ‘great deference.’ ” (Id. at pp. 199, 200.) Messiah postdates Miller-El and continues to be followed after Snyder. (See, e.g., Meikle v. Dzurenda (D.Conn., Jan. 17, 2009, No. 3:05-CV-742 (RNC)) 2009 U.S.Dist. Lexis 11883, pp. *10-*12; Perez v. *714 Smith (E.D.N.Y. 2011) 791 F.Supp.2d 291, 308-310; cf. Dolphy v. Mantello (2d Cir. 2009) 552 F.3d 236, 239 [adhering to Messiah but declining to defer to the trial court’s Batson ruling where the trial court “seemed to assume that a race-neutral explanation (Batson step two) was decisive and sufficient” (italics added)].)
State v. Angelo, supra, 197 P.3d 337, which postdates Snyder, provides another example of this approach. In Angelo, the prosecutor struck three black jurors because, as the prosecutor subsequently explained, one had previously served on a hung jury, another was familiar with the scene of the crime and had a brother who had been arrested for drug distribution, and the third had an “ ‘unfavorable disposition’ ” and had frowned when the prosecution mentioned “ ‘certain aspects of the case.’ ” (Id. at p. 347.) The trial court observed that it had “ ‘not detected a pattern of racial[ly motivated] strikes’ ” and then rejected the defendant’s Batson motion. (Id. at pp. 346-347.) With respect to the first two jurors, the trial court said only: “ ‘And so far [the prosecutor] has stated race neutral reasons for striking juror number 8 and 31.’ ” (Id. at p. 347.) With respect to the third juror, the trial court said: “ ‘The Court is going to find that again that [the prosecutor] has stated a race neutral reason for striking that particular juror ....’” (Ibid.) Later, the trial court told defense counsel that the “ ‘. . . Batson challenge [was] noted for the record . . .’ ” and was “ ‘overruled.’ ” (Ibid.) On appeal, the defendant argued that the trial court had failed to perform the analysis required at Batson’s third step. The Kansas Supreme Court “acknowledge^] the record does not reflect a clearly articulated identification of the third step.” (Ibid.) But, emphasizing that the trial court had heard the prosecution’s proffered reasons and the defense’s responses, the high court concluded that “the trial court considered this information and impliedly held [the defendant] failed to prove that the State’s reasons were pretextual and that he therefore failed in his ultimate burden to prove purposeful discrimination.” (Id. at p. 348.)
These latter decisions, among others, take the view that even when a trial court does not make explicit its reasons for rejecting a defendant’s Batson claim, a reviewing court may presume that the trial court engaged in a Batson step three analysis sufficient to determine whether the prosecution had actually discriminated on the basis of race, and thus the trial court’s denial of the claim should be accorded deference. (See Stevens v. Epps (5th Cir. 2010) 618 F.3d 489, 499 [holding Miss. Supreme Court did not unreasonably apply clearly established federal law in concluding that trial court had implicitly credited prosecution’s stated reason when rejecting Batson challenge]; State v. Sparks (La. 2011) 68 So.3d 435, 474-475; People v. Robinson (Colo.App. 2008) 187 P.3d 1166, 1173-1174.)
*715 B.
This court has aligned itself with the latter approach. Although we have said that deference to a trial court’s Batson ruling is appropriate only when the trial court “makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered” (People v. Burgener (2003) 29 Cal.4th 833, 864 [129 Cal.Rptr.2d 747, 62 P.3d 1]), our cases clearly hold that a trial court need not “make explicit and detailed findings for the record in every instance in which the court determines to credit a prosecutor’s demeanor-based reasons for exercising a peremptory challenge” so long as the reasons are not inherently implausible and are supported by the record (People v. Reynoso (2003) 31 Cal.4th 903, 929 [3 Cal.Rptr.3d 769, 74 P.3d 852]; see People v. Silva (2001) 25 Cal.4th 345, 385-386 [106 Cal.Rptr.2d 93, 21 P.3d 769]). Applying this approach, which predates Miller-El, today’s opinion accords the trial court’s Batson rulings “their usual deference” (maj. opn., ante, at p. 652) and affirms those rulings upon combing the record for evidence that might support the prosecutor’s explanations for the strikes (id. at pp. 654—663). The court does this even though the trial judge made no explicit findings and engaged in no explicit analysis regarding the validity of the prosecutor’s proffered reasons, and even though the trial judge acknowledged her inability to make such findings as to at least two and most likely three of the five black women whom the prosecutor struck. As explained below, the court errs. Deference is unwarranted because here, as in cases like Rutledge and Coombs (see ante, at pp. 646-647), a reviewing court cannot conclude on this record that the trial court actually performed the thorough inquiry at Batson's third step required by Snyder and Miller-El.
When a prosecutor relies on a juror’s demeanor to justify a peremptory strike, the trial court, having observed the proceedings, is ordinarily in a better position than an appellate court to determine whether the prosecutor’s reason is valid. Here, however, the trial court made clear that it did not recall the demeanor of Prospective Juror R.P. or R.J. The trial judge stated on the record that she had “stopped making marks after a point” during voir dire and thus “couldn’t say anything” about either RJP.’s or RJ.’s demeanor. In addition, the trial court’s comments suggest that it was unable to make any findings regarding the demeanor of Prospective Juror P.C., one of the first three black women struck. When the defense made its Batson/Wheeler motion after the first three black women were struck, the trial court observed that it had notes on “some” of them. P.C.’s voir dire had taken place after the voir dire of R.P.—in other words, after the “point” at which the trial court had “stopped making marks.” In all likelihood, the reason the trial court said it had marks on “some” but not all of the first three black women jurors struck was that it had no notes on P.C. Even if a trial court does not necessarily err any time it cannot or does not make an independent finding regarding a juror’s demeanor after the prosecutor proffers a demeanor-based explanation *716 (see Haynes, supra, 559 U.S. at pp. 45-46 [130 S.Ct. at p. 1173]), it is beyond cavil that absent such a finding, there is no basis in the record for a reviewing court to accord deference to the trial court’s customary advantage in evaluating the juror’s demeanor. (See Snyder, supra, 552 U.S. at p. 479.)
Nor is there any basis for concluding that the trial court in this case carefully examined other relevant considerations in assessing the validity of the prosecutor’s proffered explanations. Only with Prospective Juror R.P. did the trial court ever consult the transcript of the voir dire proceedings to determine if there was support for the prosecutor’s claim that the stricken jurors had expressed reluctance to impose the death penalty. And consulting the transcript resulted in the prosecutor admitting that his perception of R.P.’s reluctance “clearly” wasn’t supported by “the words that are written down.” Because the trial court said it had taken notes on “some” of the first three black women struck, it presumably had some basis to assess the validity of the prosecutor’s explanation without consulting the voir dire transcript. But the trial court had no such notes on R.J. and, in all likelihood, no such notes on P.C. With regard to PC., it is a fair inference that the trial court did not recall her demeanor or her responses; with regard to R.J., the trial court explicitly said, “I don’t recall her responses at all.” In this respect, the trial court was in a worse position than this court to evaluate the prosecutor’s stated reasons, for we have before us the record of voir dire and can evaluate whether the prospective jurors said what the prosecutor claimed they said.
The sole advantage the trial court had in this case was the opportunity to observe the prosecutor’s demeanor. The prosecutor’s demeanor in explaining a strike is certainly a relevant factor at Batson’s third step. (See Haynes, supra, 559 U.S. at p. 49 [130 S.Ct. at p. 1175]; Snyder, supra, 522 U.S. at p. 477.) But the trial court here did not make any explicit finding regarding the prosecutor’s demeanor, and there is no reason to think the trial judge accepted the prosecutor’s explanations because she implicitly found his demeanor to be credible rather than because his explanations for striking the black women jurors fit her own preconceptions about the ability of black women to impose the death penalty. (See ante, at pp. 715-716.) Moreover, even if the trial court had made a finding as to the prosecutor’s demeanor, it is questionable how much weight such a finding would have at the third step of the Batson analysis under the circumstances in this case. A trial judge’s statement to the effect that “I am unable to independently evaluate the prosecutor’s explanation, so I can only go by what the prosecutor is saying but he looks honest to me,” provides little reason for a reviewing court to defer to the trial court’s Batson ruling. The important fact remains that the trial court did not provide any indication that it actually conducted the thorough and careful inquiry required at Batson’s third step to determine whether the prosecutor’s strikes were impermissibly discriminatory. (See Rutledge, supra, 648 F.3d at p. 559 *717 [“if there is nothing in the record reflecting the trial court’s decision, then there is nothing to which we can defer”].)
Finally, if any additional reason were needed for why a reviewing court cannot defer to the trial court’s Batson rulings in this case, it is the following: While stating that she could not “say anything” regarding some of the black female jurors struck by the prosecution, the trial judge observed that in her experience “. . . Black women are very reluctant to impose the death penalty . . . .” This is precisely the sort of reliance on racial and gender stereotypes that Batson is intended to eliminate. Prospective minority jurors may not be excluded from jury service based upon “assumptions . . . which arise solely from the jurors’ race” or gender. (Batson, supra, 476 U.S. at p. 98; see J. E. B., supra, 511 U.S. at pp. 141-142.) The fact that the trial judge engaged in such race- and gender-based speculation in the course of ruling on the validity of the prosecutor’s strike—speculation that the judge went on to justify by saying, “. . . I have seen this before and I can understand why”—leads to the obvious concern that the trial judge accepted the prosecutor’s explanations precisely because she believed “. . . Black women are very reluctant to impose the death penalty . . . .” Although the trial judge subsequently backpedaled and said, “. . . I am not making my ruling based on that,” it is, to put it bluntly, pretty hard to unring that bell. Why would the trial judge have offered this observation in the first place unless she thought it was relevant to whether the prosecutor had properly removed five black women from the venire? For this reason as well as the others discussed above, the trial court’s Batson rulings are not entitled to deference on appeal.
In sum, when a trial court fails to make explicit findings or to provide any on-the-record analysis of the prosecution’s stated reasons for a strike, a reviewing court has no assurance that the trial court has properly examined “all of the circumstances that bear upon the issue” of purposeful discrimination. (Snyder, supra, 552 U.S. at p. 478.) When a trial court has not made clear that it conducted the analysis necessary to determine whether a strike was motivated by race or gender, an appellate court should not treat its ruling as though it had. The problem with doing so is illustrated by this case: Because the trial court does not appear to have conducted a proper Batson step three inquiry, and because this court has limited its review to a deferential search of the record for any evidence that might support the trial court’s Batson rulings, no court—trial or appellate—has yet performed the careful analysis required by Snyder and Miller-El to determine whether it was more likely than not that the prosecutor’s strikes of five Black female jurors were discriminatory. A proper analysis at Batson’s third step reveals strong evidence of purposeful discrimination, as I now explain.
*718 IV.
In conducting this analysis, I focus on R.P. and R.J., two jurors for whom the trial court had no notes and thus no basis for independently evaluating the prosecutor’s explanations. Upon reviewing the record, I conclude that it was more likely than not that the prosecutor’s challenges of R.P. and R.J. were based upon impermissible discrimination. This conclusion follows from the prosecutor’s pattern of strikes against black women, the vagueness of the prosecutor’s explanations for striking these jurors, and other facts in the record that support an inference of discrimination.
A.
The trial judge properly found that the prosecutor’s pattern of strikes against black female jurors raised an inference of racial discrimination, and the fact that the prosecutor ended up striking five of the six black women seated in the jury box is of course relevant to the ultimate question of whether one or more strikes were in fact motivated by discrimination. (See Miller-El, supra, 545 U.S. at p. 241 [“ ‘Happenstance is unlikely to produce this disparity.’ ”].)
The court emphasizes that the jury ultimately included one black woman. (Maj. opn., ante, at p. 663.) But the fact that the prosecution allowed a single black woman to remain on the jury does little to negate the inference that the prosecutor’s prior strikes were discriminatory. As the prosecutor explained after having struck the fifth black woman in the venire (R.J.), he was worried about “making a Wheeler motion” and “offending the blacks on the jury.” The prosecutor’s failure to strike a sixth black female juror is therefore hardly surprising and not especially probative of his motivations in striking the prior five. As the high court observed when considering a comparable situation in Miller-El: “This late-stage decision to accept a Black panel member . . . does not . . . neutralize the early-stage decision to challenge a comparable venireman .... In fact, if the prosecutors were going to accept any Black juror to obscure the otherwise consistent pattern of opposition to seating one, the time to do so was getting late.” (Miller-El, supra, 545 U.S. at p. 250.)
Other relevant circumstances support an inference of discrimination. The racial overtones of this trial, in which a black man was charged with capital murder, were apparent to all those present in the courtroom. For example, the trial judge mentioned the Rodney King case and asked prospective jurors whether it would affect their ability to impartially listen to testimony by a police officer. The prosecutor, speaking to the entire venire after striking the fifth black woman, said it was not a “mystery” that every time he struck “a *719 female Black” the trial court held a hearing, and he insisted the strikes were not racially motivated. Notwithstanding his protestations of good faith, it is clear that the prosecutor was quite cognizant of the race of the jurors he struck, and he was also aware that the principal defense witness was going to be a black woman.
Moreover, the prosecutor explicitly acknowledged that race had played a role in his exercise of peremptory challenges. At the close of jury selection, the prosecutor indicated for the record that he had used his last peremptory challenges to strike “White jurors” and that he had done so in part because he “wanted a greater mix of racial diversification on [the] jury.” (Maj. opn., ante, at p. 663.) My colleagues say these comments “do not appear to . . . show that [the prosecutor] discriminated against African-American women jurors.” (Ibid.) But the fact that the prosecutor consciously selected some jurors on the basis of race reasonably supports an inference that his strikes of the five black female jurors were informed by similar considerations.
B.
The reasons given by the prosecutor to explain his strikes warrant particularly close scrutiny and provide good cause to doubt their validity. The fact that the prosecutor apparently believed that every single one of the first five black women in the jury box should be struck for precisely the same reason is itself cause for suspicion. This suspicion is heightened by the vagueness and generality of the prosecutor’s stated explanations. He described his concerns regarding each of these five prospective jurors in almost exactly the same way, saying that their responses and demeanor had led him to believe they would be reluctant to impose the death penalty. Only once, when he invoked R.R’s statements regarding the deterrent value of the death penalty, did he attempt to refer specifically to a response that any of these jurors had given in their questionnaires or during voir dire—and in that case, as noted, the prosecutor ended up admitting that R.R’s statements did not support his belief that she would be reluctant to impose the death penalty.
The prosecutor’s vague references to the jurors’ demeanor are especially suspect. With respect to the first three challenged jurors, he said “their reluctance to impose it was evident not only from the answers they gave [but] from the time that it took them to respond to the question, their general demeanor in answering the questions and my impression from each of them.” He added that it was his “general impression from their answers that in spite of what they said, they wouldn’t have the ability to impose it.” With respect *720 to R.P., the prosecutor said; “It was my general impression from the way she answered the questions, not what she said.” And with respect to R.J., the prosecutor said: “It is my impression not only from her answers to the questions but her demeanor and the fashion in which she answered them .... I don’t know how to exactly express it for the record. . . . But sometimes you get a feel for a person ...” The prosecutor did not point to a single specific aspect of R.P.’s or R.J.’s demeanor that supported his belief. The prosecutor did not say, for example, that either juror had paused before answering a particular question, had failed to make eye contact, or had appeared nervous or upset.
An attorney may rely on a juror’s demeanor in justifying a peremptory strike, but demeanor-based reasons warrant careful scrutiny. “Nonverbal conduct or demeanor, often elusive and always subject to interpretation, may well mask a race-based strike. For that reason, trial courts must carefully examine such rationales.” (Davis v. Fisk Electric Co. (Tex. 2008) 268 S.W.3d 508, 518; see Smith v. U.S. (D.C. 2009) 966 A.2d 367, 383; Commonwealth v. Maldonado (2003) 439 Mass. 460 [788 N.E.2d 968, 973]; State v. McFadden (Mo. 2007) 216 S.W.3d 673, 676, fn. 17; Raphael & Ungvarsky, Excuses, Excuses: Neutral Explanations Under Batson v. Kentucky (1993) 27 U.Mich. J.L. Reform 229, 246 [studying all published cases applying Batson in the first five years after that decision and concluding: “A juror’s demeanor is an extremely frequent neutral explanation in our study. It is also the most subjective type of explanation and thus, the easiest and most likely pretext for striking Black jurors.”].) Careful scrutiny is especially appropriate where, as here, the prosecutor’s descriptions of the jurors’ purported demeanor are entirely nonspecific. (See Brown v. Kelly (2d Cir. 1992) 973 F.2d 116, 121.)
In this respect, the prosecutor’s explanation for striking R.R is particularly questionable. The prosecutor, after reviewing R.P.’s voir dire transcript, disclaimed any reliance on R.R’s responses and then rested his explanation on the following general assertion regarding R.R’s demeanor: “It was my general impression from the way she answered the questions, not what she said.” This proffered reason is the sort of vague and conclusory explanation for a peremptory challenge that is particularly susceptible to masking improper discrimination. If the prosecutor had some valid basis for this strike, one would expect him to have been able to articulate it. “It is true that peremptories are often the subjects of instinct, [citation], and it can sometimes be hard to say what the reason is. But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives.” (Miller-El, supra, 545 U.S. at p. 252.) “ ‘Clearly the most vulnerable reasons are those based on hunches and intuitions.’ ” (Caldwell v. Maloney (1st Cir. 1998) 159 *721 F.3d 639, 651; see U.S. v. Bentley-Smith (5th Cir. 1993) 2 F.3d 1368, 1375 [“An attorney who claims that he or she struck a potential juror because of intuition alone, without articulating a specific factual basis such as occupation^] family background, or even eye contact or attentiveness, is more vulnerable to the' inference that the reason proffered is a proxy for race.”].)
C.
There is ample reason to believe that this “vulnerable” explanation for the strike of R.P., along with those given for the prosecutor’s strike of R.J., in fact masked an improper discriminatory purpose. Examination of these jurors’ responses in their questionnaires and during voir dire demonstrates that the prosecutor lacked any firm basis for believing they would have been reluctant to impose the death penalty, which further strengthens the inference of purposeful discrimination in this case.
Today’s opinion examines the record and reaches the opposite conclusion. (Maj. opn., ante, at p. 654 [“We conclude that the record supports the prosecutor’s stated reasons for exercising the peremptory challenges.”].) But the court does not perform the careful analysis required by and demonstrated in Snyder and Miller-El. Instead of thoroughly examining the record to determine whether it was more likely than not that the prosecutor struck one or more of the five black female jurors based on purposeful discrimination, the court merely scours the record for statements by the stmck jurors that might support the prosecutor’s explanations (even though the prosecutor did not specifically rely on any of the statements that the court cites) and dismisses in a footnote the comparable statements made by other jurors. (See maj. opn., ante, at pp. 654-661, 661-663 & fn. 22.)
The court’s analysis reflects the erroneously deferential standard that it applies in reviewing the trial court’s Batson rulings. (See ante, at pp. 645, 651.) It also appears to reflect the court’s understanding of the “inherent limitations” of comparative juror analysis. (Maj. opn., ante, at p. 662.) To be sure, “ ‘[a] transcript will show that the panelists have similar answers: it cannot convey the different ways in which those answers were given.’ ” (Ibid.) But here the cold transcript is what we must examine because the trial court did not make any findings regarding the “ ‘different ways in which . . . answers were given’ ” by R.P. or R.J. Although “retrospective comparison[s] of jurors based on a cold appellate record may be very misleading . . .” when the “alleged similarities” between the stmck jurors and seated jurors were not explored in the trial court (Snyder, supra, 552 U.S. at p. 483), that is not the *722 case here. The reason given by the prosecutor for striking R.P. and R.J. had to do with a personal characteristic—an individual’s ability to impose the death penalty—that had been the central focus of the lengthy jury selection process conducted to that point. Because the “shared characteristic . . . was thoroughly explored by the trial court . . .” and by the parties, it provides a relatively strong basis for concluding that jurors who appeared to be similar were in fact “comparable.” (Ibid.) As detailed below, comparative juror analysis casts significant doubt on the prosecutor’s stated reasons for striking R.P. and R.J.
1.
As the court acknowledges, R.P.’s questionnaire “generally indicated a willingness to impose the death penalty.” (Maj. opn., ante, at p. 656.) She wrote that the death penalty is “sometimes necessary,” that it is not imposed too often in this state, and that California should have the death penalty because “more people would think before committing a serious crime.” She believed that the death penalty’s purpose is to be “a deterrent to crime.” She also indicated that crime was a “very serious” problem and that she would like to be a juror in this capital case.
Contrary to the court’s contention, R.R’s voir dire answers did not suggest that she was any less willing to impose the death penalty than her questionnaire responses showed her to be. R.P. said she would be able to follow the law and could impose the death penalty. When asked whether she could vote to put defendant himself to death, she answered: “I feel I could.”
In its search for any hint of reluctance, the court focuses entirely on an exchange with the prosecutor in which R.P. said the death penalty would serve as a deterrent to some people when imposed in some cases. (Maj. opn., ante, at pp. 656-657.) As R.P. put it during voir dire: “Sometimes it would and sometimes it would not. With some people it would and with some people it would not.” Instead of demonstrating RJP.’s reluctance to impose the death penalty, these comments simply show that R.P. understood the concept of deterrence. Few if any people would seriously contend that imposing the death penalty in a given case will deter all potential future criminals who might otherwise commit similar crimes. The fact that R.P. had not seriously considered how or when the death penalty might serve such a deterrent purpose has little bearing on her ability to impose it. Indeed, having claimed that he struck R.P. because of her reluctance to vote for the death penalty, the prosecutor admitted after reviewing R.P.’s voir dire transcript that any reluctance he perceived “clearly [wasn’t] from the words that are written down.”
*723 A number of other jurors whom the prosecution allowed to remain on the jury expressed similar views. “If, indeed, [R.P.’s] thoughts on [deterrence] did make the prosecutor uneasy, he should have worried about a number of . . . panel members he accepted with no evident reservations.” (Miller-El, supra, 545 U.S. at p. 244.)
Most of seated Juror B.H.’s questionnaire answers regarding the death penalty were almost identical to those of R.P. He wrote that the death penalty is “necessary sometimes,” that California should have the death penalty “to deter would-be criminals,” and that the purpose of the death penalty was to be a “deterant [íz'c].” But he also said the death penalty would be inappropriate in cases where the defendant could be rehabilitated, writing: “Some people can be rehabilitated. Death penalty should not apply to those.” He elaborated during voir dire: “I do believe in rehabilitation, I believe in that, that some people can be rehabilitated. I also believe that some people can’t. So based on that kind of thinking that would allow me to go along with the death penalty in certain kinds of circumstances, and I don’t have any canned ideas of what the circumstances would be. I would try to deal with it on a case by case basis.” When asked during voir dire whether he would vote for death, B.H. responded: “Never having done it before I believe I could. Without having that experience, you know, it’s kind of a hard thing to say, yeah, I definitely will, but I believe that I could do that if that’s what I felt was necessary.” This response is arguably more, and certainly not less, equivocal than R.P.’s succinct and direct response to the same question (“I feel I could.”).
Seated Juror W.J. also gave responses that suggested at least as much reluctance to impose the death penalty as did those of R.P. In his questionnaire, WJ. wrote that life imprisonment was a more severe punishment than the death penalty, and he explained during voir dire: “[L]ife imprisonment, I think would just let the person, you know, just see how they really mess up, you know. I believe it would just be over with.” These comments led the prosecutor to express “concern” that W.J. would impose “life in prison without the possibility of parole because [he thought] that’s worse than the death penalty.” When asked by the prosecutor whether he would be able to “return the death penalty” if he came to the conclusion that it was “the appropriate verdict,” W.J. responded: “Yes, I think so.” After the prosecutor slightly rephrased the question, W.J. responded: “If that was the appropriate thing.” These less than firm responses apparently were sufficient to dispel the prosecution’s “concern” with respect to W.J.’s ability to impose the death penalty.
Seated Juror W.C. also appears to have given the prosecution at least as much cause for concern as R.P. On his questionnaire, W.C. indicated that he *724 did not know whether he would refuse to find defendant guilty of first degree murder in order to avoid the issue of the death penalty. He also circled “no” in response to a question asking whether, if the trial reached the penalty phase, he “would automatically, in every case, regardless of the evidence, vote for the death penalty,” but circled “don’t know” in response to the question asking whether he would “regardless of the evidence, vote for life in prison without the possibility of parole.” By contrast, R.P. answered “no” to both questions. During voir dire, when asked by defense counsel where on the spectrum he was between someone who would never impose the death penalty and someone who would impose it on all murderers, W.C. responded: “Probably split down the middle. I would want to hear all the circumstances and the evidence to determine, you know, if it was appropriate.”
Finally, Alternate Juror D.V.’s views on the death penalty were somewhat equivocal. He wrote on his questionnaire and repeatedly stated in voir dire that he was “neither for nor against it.” D.V. was definitive, however, in his belief that the death penalty was not a deterrent. When asked by the prosecutor, “Do you think the death penalty serves any deterrent value at all?” D.V. simply responded: “No.”
2.
The record similarly belies the prosecutor’s stated reasons for striking Prospective Juror R.J. As an initial matter, the court offers an implausible reading of the record when it suggests that the prosecutor, in striking R.J., likely believed it was striking D.J., another black woman with the same last name. (Maj. opn., ante, at pp. 659-661.) It is true that during the hearing on a motion for new trial that occurred 15 months after jury selection, the prosecutor mistakenly referred to D.J. in explaining his strike of R.J. Such a mistake is understandable, as the jury selection process was no longer fresh in the parties’ minds, and at that point they had before them only the written record of the proceedings.
But there is no reason to think that the prosecution had made this same mistake 15 months earlier. R.J. was more than 25 years older than D.J., a significant difference that the prosecutor would have recognized when making peremptory challenges with all prospective jurors sitting before him in the courtroom. Moreover, if the prosecutor had actually believed that R.J. was D.J., he would have proceeded very differently. As the court observes, D.J. was emphatic in her opposition to the death penalty. (Maj. opn., ante, at p. 661.) She wrote on her questionnaire, “I’m against the death penalty,” and repeatedly suggested during voir dire that she would choose life without the possibility of parole over the death penalty no matter what evidence was presented at the penalty phase. During voir dire, the prosecutor *725 said to her, “Clearly you don’t believe in the death penalty,” and she responded, “Right.” For these reasons, the prosecutor made a motion to challenge her for cause, which the trial court denied only after prompting D.J. to affirm that she could impose the death penalty “if she felt the penalty was appropriate.” Had the prosecutor believed that D.J. rather than R.J. was sitting in the jury box, in all likelihood he would have challenged her as soon as he could instead of accepting three panels on which she was seated. He also would have given a different explanation for this strike. As noted, the prosecutor explained that he struck this juror because he did not believe she would be able to impose the death penalty, but that he did not “know how to exactly express it for the record.” He further explained: “[Sjometimes you get a feel for a person that you just know that they can’t impose it based upon the nature of the way that they something.” Had he believed he was striking D.J. instead of R.J., he would have had no such difficulty describing his perception. He would have cited D.J.’s statements that she was against the death penalty, that she did not believe in it, and that she would choose life without the possibility of parole over the death penalty. Certainly, he would have mentioned that he had previously challenged D.J. for cause based on her inability to impose the death penalty. The fact that the prosecutor gave none of these obvious explanations confirms that he understood he was striking RJ.
There is little basis in the record to support the prosecutor’s explanation for this strike. As the court admits, “R.J.’s written questionnaire generally expressed support for the death penalty . . . .” (Maj. opn., ante, at p. 658.) She indicated that the death penalty was not imposed too often, that she believed that this state should have capital punishment, and that she would like to serve as a juror in this capital case. She wrote that the death penalty is justified: “So that perpetrators and victims’ families & friends could end experiences with finality. To let the punishment fit the crime.” Her answers at voir dire confirmed her willingness to impose the death penalty. She answered, “Yes, I would,” when asked whether she would have the ability to return a death verdict if it was warranted.
The court concludes that some of R.J.’s questionnaire responses “contained qualifying language that can reasonably interpreted as showing equivocation or hesitation.” (Maj. opn., ante, at p. 658.) But the court cites a number of responses that either display no such “equivocation or hesitation” or fail to distinguish her from other jurors who were permitted to serve. In the course of explaining why she believed that California should have the death penalty, R.J. said “ ‘the penalty would be somewhat of a solace to the friends, family of the victim.’ ” (Maj. opn., ante, at p. 658, italics added by maj.) The court does not explain how R.J.’s slight qualification of the degree to which the penalty would provide solace to the victim’s family constituted a qualification of her support for the death penalty or her willingness to impose it. Few *726 would argue that the execution of a victim’s killer would provide complete consolation for the victim’s family or friends.
The court also observes that RJ. circled “ ‘agree somewhat’ ” (maj. opn., ante, at p. 659) in response to the statement: “Anyone who intentionally kills another person without legal justification, and not in self-defense, should receive the death penalty.” The other available choices were “strongly agree,” “strongly disagree,” or “disagree somewhat.” As RJ. explained, she did not “strongly agree or disagree” with the statement, so “somewhat comes closest to any answer I could give at this point.” It is difficult to see why the court believes this response showed R.J.’s hesitancy to impose the death penalty. Among the available options, “agree somewhat” was the answer that both demonstrated support for the death penalty and comports with California’s capital punishment scheme, which does not provide that anyone who intentionally kills without legal justification will be sentenced to death. (See Pen. Code, §§ 190.2, 190.3.) Perhaps more importantly, it was also the answer circled by six of the 12 seated jurors.
The court also relies on the fact that RJ. indicated on her questionnaire that she did not know whether life in prison was a more severe punishment than the death penalty. (Maj. opn., ante, at p. 659.) Even if this answer suggests reluctance to impose the death penalty, it did not distinguish her from a number of seated jurors, four of whom also circled “not sure” in response to this question and another three of whom indicated that they believed that life imprisonment was actually a more severe punishment than the death penalty.
Finally, as with R.P., the court relies on R.J.’s comments regarding the deterrent value of the death penalty. On her questionnaire, R.J. wrote: “Capital punishment has never been a deterrent to crime but it is necessary in our society because so many people think it is.” During voir dire, defense counsel asked her to elaborate on this statement, and she responded: “Oh, there is no elaboration on it. I just don’t think that it is a deterrent to crime and that is based on the fact that there are so many people in jail for capital crimes.” R.J.’s statements regarding deterrence provide little basis to question her willingness to impose the death penalty, especially since RJ. made clear her belief that capital punishment “is necessary in our society” even if it does not deter crime. That these comments were not cause for concern is further evidenced by the fact that the prosecutor never questioned RJ. regarding her beliefs about the deterrent value of the death penalty. In light of her expressed “support for the death penalty, we expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike.” (Miller-El, supra, 545 U.S. at p. 244.)
*727 Comments made by other prospective jurors whom the prosecutor did not strike provided a stronger basis to infer reluctance. As noted, seated Juror B.H. said the death penalty should not be imposed on those who could be rehabilitated. When asked if he personally could vote to impose the death penalty, his response was more equivocal than R.J.’s straightforward answer to the same question (“Yes, I would”). Similarly, the record provides no reason to think that RJ. was any more hesitant than seated Jurors WJ. and W.C., whose reservations about the death penalty have been discussed above. And if R.J.’s beliefs about the deterrent value of the death penalty were such a particular cause for concern, one would have expected the prosecutor to have challenged Alternate Juror D.V., who flatly denied that the death penalty “serves any deterrent value at all.”
D.
In sum, a strong inference of purposeful discrimination arises from the pattern of the prosecutor’s strikes of the first five black women in the jury box, from the uniformity, vagueness, and generality of the prosecutor’s explanations, and from the questionnaire and voir dire responses of Prospective Jurors R.P. and RJ. considered by themselves and in comparison with the responses of seated jurors. Any residual uncertainty about this conclusion attributable to a void in the record concerning R.P.’s and RJ.’s demeanor can hardly be constmed against defendant when neither the trial court nor the prosecutor made a single specific observation about either juror’s demeanor in support of the prosecutor’s demeanor-based reason for his strikes. Because the void cannot be addressed by a remand more than two decades after the trial, defendant’s conviction must be reversed. (See Snyder, supra, 552 U.S. at p. 486.)
This court has put itself on the wrong side of a split among federal and state courts on how to treat a trial court’s denial of a defendant’s Batson motion when the trial court has not made clear on the record that it considered all relevant circumstances bearing on the issue of purposeful discrimination in jury selection. A summary, unexplained denial in a case such as this does not indicate that the trial court understood and fulfilled its obligation to conduct the Batson inquiry with the degree of thoroughness and care demonstrated and required by Snyder and Miller-El. Under this court’s approach, a Batson claim may be rejected even though no court, trial or appellate, has ever conducted a proper Batson step three analysis. In this case, such an analysis shows that with respect to at least two of the five black women stmck, it was more likely than not that the prosecutor’s strikes were *728 impermissibly discriminatory. Thus, the jury that convicted defendant and sentenced to him to death was selected in a manner that violates the constitutional guarantee of equal protection of the laws.
I respectfully dissent.
Appellant’s petition for a rehearing was denied June 19, 2013.